No. 3–05–0420

Filed February 10, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Fourteenth Judicial Circuit, Henry County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04–CF–51 |
| ANDRES ROA, | ) ) | Honorable Larry S. Vandersnick, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WRIGHT delivered the opinion of the court:

Defendant Andres Roa appeals from his conviction for violation of section 401(a)(2)(A) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(A) (West 2004)). On appeal, defendant raised the single issue of whether the trial court improperly denied his motion to suppress evidence seized during a consensual search of defendant's vehicle. We affirmed the decision of the trial court on October 31, 2007. Defendant appealed to our supreme court which, in light of the postopinion case of *People v. Cosby*, 231 Ill. 2d 262 (2008), ordered this court to vacate its earlier judgment and reconsider its decision to determine if a different result is now warranted. *People v. Roa,* 229 Ill. 2d 687 (2008)(order). In light of *Cosby*, 231 Ill. 2d at 262, we

affirm the trial court's decision.

BACKGROUND

Defendant was operating a vehicle he recently purchased when an Illinois state trooper stopped him for speeding at 71 miles per hour in a posted 65 mile per hour zone on Interstate 80 in Henry County, Illinois. The officer, Sergeant Floyd Blanks, is a certified drug interdiction instructor and the drug interdiction coordinator for his district. He has been employed by the State Police for 17 years.

According to the officer, after stopping defendant for speeding, he approached the car, advised defendant he was going to issue a written warning for speeding, and asked for defendant's license and registration. Blanks stated that defendant fumbled for those documents, seemed "to exhibit more physical stress than most people do," and mumbled while staring straight ahead. Blanks immediately advised defendant he was going to issue a written warning. At some point during the traffic stop, Blanks asked defendant where he was traveling from and where he was going. Defendant told Blanks that he was traveling from Colorado to New York.

 Blanks said defendant seemed "to exhibit more physical stress than most people do, along with a couple of other factors." Despite being informed that he was going to receive a warning, defendant remained nervous and, "in this case, that's why I [Blanks] requested consent to search the vehicle." Blanks also noticed a new air freshener and a strong odor of air freshener emanating from the car, which piqued Blanks' suspicion.

According to Blanks, when he returned to his squad car to write a warning ticket, he knew, "with [defendant's] nervousness, the odor of air freshener, ***[he] was going to try to obtain permission to search that vehicle." Blanks testified, "I knew from my training and

2

experience that something was amiss, something was wrong, so I requested assistance from Trooper Clint Thulen."

Blanks did issue a written warning for the speeding violation. Once he delivered the written warning citation, Blanks returned defendant's license, registration and insurance card. According to defendant, as the officer started to return to his squad car, the officer said, "Wait a minute, Andres," and then asked defendant for permission to conduct a search of defendant's car. Defendant consented.

According to Blanks, the conversation with defendant, before asking for consent, was slightly longer. The officer recounted that, after issuing a written warning and returning defendant's license and insurance card, he asked defendant if everything in the vehicle belonged to him and whether anyone had asked defendant to transport anything. Defendant responded that everything in the vehicle belonged to him and no one had asked him to transport anything. Blanks then asked if there was anything illegal in the vehicle, including any alcohol, weapons, or drugs. The defendant replied, "no." Blanks then asked if he could search the vehicle. Defendant's response was, "yes." According to Blanks, if defendant had refused permission to search his car, Blanks would have allowed him to drive away.

After obtaining consent, Blanks asked defendant what was in the trunk. Defendant answered, "antiques," and offered to show him an antique dealer's card. At Blanks' request, defendant opened the trunk and found it was empty. Blanks felt this was unusual since defendant had just told him there were antiques in the trunk.

As requested, Trooper Thulen arrived on the scene during the initial moments of the search, while Blanks was standing near the trunk of defendant's car. Together, the officers then

proceeded to the front of the vehicle. Blanks noticed that the air bag area appeared to have been tampered with or modified. After a 20-minute search, which included using a fiberoptic scope, the officers discovered a hidden compartment containing cocaine. Later, when the compartment was disassembled, the troopers found the compartment contained a total of 24.2 pounds of cocaine. The cocaine was packaged in 11 separate packages.

Initially, defendant faced three charges based on this evidence. Count I alleged defendant knowingly brought more than 900 grams of cocaine into the State of Illinois with the intent to deliver in violation of section 401.1(a) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/401.1(a) (West 2004)). Count II alleged defendant knowingly possessed with the intent to deliver more than 15 but less than 100 grams of cocaine in violation of section 401(a)(2)(A) of the Act (720 ILCS 570/401(a)(2)(A) (West 2004)). Finally, count III alleged that defendant possessed more than 900 grams of cocaine in violation of section 402(a)(2)(D) of the Act (720 ILCS 570/402(a)(2)(D) (West 2004)).

Prior to trial, defense counsel filed a motion to suppress the cocaine, alleging the police expanded a traffic stop into a drug investigation without probable cause. During the hearing on the motion, the trial court heard testimony from Sergeant Blanks regarding factors he considers when looking for drug-related activities. According to Blanks, ongoing nervousness is only one of many factors indicating illegal activity. Blanks explained to the court:

"There are a number of things that we are trained to observe, such as third-party vehicles, vehicles rented by someone else, the odor of air freshener and masking agents in the vehicle, a vehicle that looks lived in, a vehicle with numerous energy drinks or coffee cups showing they've been driving all night,

4

cigarettes and nervousness, and I could go on and on, sir."

Trooper Clint Thulen also testified at the suppression hearing. Thulen testified that he has been employed by the State Police for 14 years as a patrol officer and currently as a canine handler. When Thulen arrived on the scene of the stop, Blanks was searching defendant's trunk. According to Thulen, defendant appeared unusually nervous and exhibited signs of stress. Defendant seemed unusually uncomfortable, "out of sorts," and avoided eye contact.

Following the testimony of defendant, Sergeant Blanks and Trooper Thulen and arguments of counsel, the trial court denied the motion to suppress, finding Sergeant Blanks' search was properly based on three grounds. First, the court noted Sergeant Blanks had probable cause for the initial traffic stop based on speeding. Second, the court found the duration of the traffic stop was reasonable because Sergeant Blanks did not delay asking for consent to search. Finally, the judge concluded, based on the totality of the circumstances, Sergeant Blanks had a reasonable, articulable suspicion that defendant was engaged in criminal conduct.

Applying a totality-of-the-circumstances approach, the court considered the officer's description of the circumstances the officer encountered. Relevant factors included defendant's extreme nervousness, mumbling, fumbling, straightforward gaze, abnormal physical stress, and a new air freshener that piqued the officer's curiosity and suspicion. The court heavily weighed Sergeant Blanks' vast experience in drug interdiction, finding Sergeant Blanks' training would give a person in his position a reasonable, articulable suspicion that there was some kind of criminal activity afoot. Accordingly, the trial court denied defendant's motion to suppress evidence.

Defendant's first jury trial resulted in a deadlocked jury. Subsequently, the State

dismissed counts I and III of the information and, following a stipulated bench trial on count II only, the trial judge found defendant guilty of unlawful possession with intent to deliver more than 15 grams but not more than 100 grams of a controlled substance, in violation of section 401(a)(2)(A) (720 ILCS 570/401(a)(2)(A) (West 2004)). The court sentenced defendant to 15 years' imprisonment. Following the denial of his posttrial motions, defendant timely appealed on the ground that his motion to suppress should have been granted.

This court issued an opinion in this case on October 31, 2007, affirming the decision of the trial court, and defendant then filed an appeal with our supreme court. On December 31, 2008, the supreme court denied defendant's leave to appeal, but entered a supervisory order requiring this court to vacate its prior judgment, in light of a postopinion case of *People v. Cosby*, 231 Ill. 2d 262 (2008), and directed this court to "reconsider its judgment*** to determine if a different result is warranted." *Roa,* 229 Ill. 2d 687.

ANALYSIS

The State, after remand from our supreme court, asserts the police officer's request for a consent to search defendant's vehicle did not constitute a seizure under the fourth amendment according to the holding in *Cosby*. Defendant, after remand, contends that defendant did not feel free to leave when Sergeant Blanks asked for consent to search the vehicle. Consequently, defendant argues that the conversation following the end of the traffic stop created a second seizure of defendant. Defendant further contends that this court must now adhere to the view that a second seizure occurred because this premise was adopted by the author in our earlier decision and then mirrored in Justice McDade's dissent to that decision.

We begin with defendant's contention that we are bound by the premise that a second

6

seizure occurred in this case when the officer requested consent to search defendant's vehicle. This argument ignores that our supreme court issued a supervisory order with directions to this court to *reconsider* our judgment in light of the most recent pronouncement of law from our supreme court contained in *Cosby*. *Cosby*, 231 Ill. 2d 262.

This court's previous decision, now under review, was based, in part, upon our supreme court's decision in *People v. Gonzalez*, 204 Ill. 2d 220 (2003), that focused on the scope of the stop. The *Gonzalez* court originally pronounced a two-prong approach for determining whether a lawful traffic stop could become constitutionally impermissible by unduly prolonging the detention or by fundamentally altering the nature of the stop. *Gonzalez,* 204 Ill. 2d at 235. The *Cosby* court noted that the decision in *Muehler v. Mena,* 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), struck down the approach that focused on the alteration of the fundamental nature of the stop previously employed by our supreme court. See *Cosby*, 231 Ill. 2d at 276, citing *People v. Harris*, 228 Ill. 2d 222, 240 (2008). In *Harris*, our supreme court held that *Gonzalez,* 204 Ill. 2d at 220, has been "unequivocally overruled" by the Supreme Court's subsequent decision in *Muehler*. *Harris*, 228 Ill. 2d at 240.

Although the duration prong clearly survives based upon *Illinois v. Caballes,* 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), the alteration of the scope of the stop is no longer an appropriate consideration. *Harris*, 228 Ill. 2d at 240. Based upon the changes in the law since our first opinion, we reject defendant's contention that we are bound by our initial holding regarding a second seizure, which was based on case law that has since been interpreted and modified by other higher courts.

Generally, the review of a trial court's ruling on a motion to suppress involves a two-part

standard of review which presents mixed questions of law and fact. *Cosby*, 231 Ill. 2d at 271; *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006)). The reviewing court first examines whether the trial court's factual findings are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542. Second, we review *de novo* the trial court's ultimate ruling as to whether suppression is warranted. *Harris*, 228 Ill. 2d at 230.

As directed by our supreme court, we have vacated our prior judgment in this case and now must determine if a different outcome is warranted based on *Cosby*. The *Cosby* court analyzed the question of whether a consent to search after a traffic stop becomes a seizure by applying the principles set forth in its earlier case of *People v. Brownlee,* 186 Ill. 2d 501 (1999) and the United State's Supreme Court's decision in *United States v. Mendenhall,* 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980). *Cosby*, 231 Ill. 2d at 276-77. The *Cosby* case involved two consolidated cases for purposes of the appeal to the supreme court: *People v. Cosby*, No. 100681, and *People v. Mendoza*, No. 102584. In both cases, our supreme court determined that none of the *Mendenhall* factors were present and, therefore, fourth amendment seizures of the defendants did not occur. *Cosby*, 231 Ill. 2d at 282-88.

Following the decision in *Cosby*, the mandates of *Mendenhall* are even clearer and the holding of *Brownlee* remains intact. In *Brownlee*, our supreme court acknowledged that an officer is always free to request permission to search. *Brownlee*, 186 Ill. 2d at 515, citing *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996). However, our supreme court noted that a person is seized when, in view of all the facts and circumstances, he would not feel free to leave. *Brownlee*, 186 Ill. 2d at 517.

Questioning of a seized individual alone may not unduly prolong a stop or constitute an

8

additional seizure within the meaning of the fourth amendment. *Harris*, 228 Ill. 2d at 243, citing *Muehler,* 544 U.S. at 101, 161 L. Ed. 2d at 309, 125 S. Ct. at 1471. Thus, we must apply the *Mendenhall* factors to determine if the questioning by Blanks, after issuing the warning ticket, would cause a reasonable person to feel he was not free to leave. *Harris*, 228 Ill. 2d at 243. The *Mendenhall* factors include: (1) whether there was a threatening presence by several officers; (2) whether the officer displayed a weapon; (3) whether there was some physical touching by the officer; and (4) whether the language or tone of voice used by the officer indicated that compliance with the officer's request was compelled. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d 509, 100 S. Ct. at 1877.[1]

First, Sergeant Blanks was the only officer present at the stop when the questioning regarding consent to search took place. Second, the officer did not display his weapon in a threatening manner. Third, there was no indication that the officer physically touched defendant. Finally, in reviewing the record, we find there is nothing to suggest that the officer used forceful language or an intimidating tone when communicating with defendant and requesting defendant's permission to search his vehicle. Accordingly, in the absence of all of the *Mendenhall* factors as applied to the facts in the instant case, we find that defendant was not seized for purposes of the fourth amendment. See *Cosby*, 231 Ill. 2d at 287-88.

Next, we consider whether the four questions posed by Sergeant Blanks in this case unduly prolonged the encounter in violation of the fourth amendment. The record shows Blanks,

---

[1]In this case, the State concedes that the traffic stop for speeding ended with the delivery of the written warning citation. However, this concession is no longer relevant because the nature of the scope of the stop is no longer a valid consideration after the *Harris* decision. *Harris*, 228 Ill. 2d at 244.

after issuing the warning and returning the paperwork to defendant, immediately posed three questions that were short, succinct, and formulated to produce "yes" or "no" responses. The fourth and final question from the officer produced defendant's voluntary consent for the officer to conduct a search. These questions were similar in nature to the questions asked by the officers in *Cosby*. Therefore, we conclude the inquiries by Blanks did not unfairly convert this lawful stop into an unconstitutional seizure of defendant or his vehicle.

There are three tiers of lawful police-civilian encounters: (1) arrests supported by probable cause; (2) brief investigatory detentions, justified by a reasonable, articulable suspicion of criminal activity (*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)); and (3) consensual encounters involving no coercion or detentions that do not implicate fourth amendment interests. *Luedemann,* 222 Ill. 2d at 544. Here, the initial traffic stop was based upon probable cause to believe defendant was speeding.

Originally, in his special concurring opinion, Presiding Justice Lytton concluded the police-citizen interaction after the officer delivered the written warning qualified as a third-tier "consensual encounter" under *Luedemann,* 222 Ill. 2d at 544. *People v. Roa*, 377 Ill. App. 3d 190, 205 (2007)(Lytton, P.J., concurring). The decision in *Cosby* reveals Justice Lytton was correct. In light of *Cosby*, we are now in agreement that Blanks' request for consent to search was constitutionally permissible under the fourth amendment as a third tier consensual encounter.

While defendant admits his decision to give Sergeant Blanks his consent to search was voluntary, on remand defendant alleges Blanks waited several additional minutes for Officer Thulen to arrive. Defendant also argues that his consent to search was limited in scope. The

record reflects that Sergeant Blanks testified defendant consented to his search of the "vehicle" and that he began the search before the arrival of Officer Thulen.

The conflict in the testimony required the trial court to make a credibility determination regarding the duration of the stop and the scope of the consent. Matters of credibility are for the trial court to decide. This court should not rule on such matters because the trial court was in a position to observe the witnesses, assess their demeanor, and make credibility judgments based on a firsthand encounter with the witnesses. *People v. Hornsby*, 277 Ill. App. 3d 227, 230-31 (1995). Here, the record sustains the trial court's finding that Blanks was a credible witness. We conclude the court's findings were not against the manifest weight of the evidence simply because the circumstances that triggered the officer's suspicion involved multiple layers of conduct which, standing alone, could be considered as innocent, law-abiding behavior.

As stated in our prior opinion, effective and efficient interstate drug couriers can successfully avoid apprehension by camouflaging their illegal activity with something as innocuous as an air freshener. Meaningless minutiae that might go unnoticed by the untrained person may become a significant factor to an experienced drug interdiction officer considering the totality of the circumstances attendant to the traveler at hand. The trial judge found the officer's testimony credible and the basis of his suspicions justified.

Pursuant to the directive of our supreme court, we vacate our previous judgment in this case. Additionally, based upon our *de novo* review of the facts as applied to the most recent case law, we hold the motion to suppress contraband was properly denied because defendant's interaction with Officer Blanks, after receiving the written warning, was voluntary and consensual. Accordingly, we affirm the circuit court's decision to deny defendant's motion to

11

suppress evidence seized from his vehicle.

CONCLUSION

The judgment entered in this case on October 31, 2007, has been vacated. Additionally, after reconsidering our previous decision in light of *Cosby* as directed by the supervisory order of our supreme court, we affirm the order of the circuit court of Henry County denying defendant's motion to suppress the evidence obtained from the consensual search .

Affirmed.

LYTTON, J., concurs.

No. 3--05--0420

_____

Filed February 10, 2010–**CORRECTION**

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| THE PEOPLE OF THE STATE OF | ) | Appeal from the Circuit Court |

| ILLINOIS, | ) | of the Fourteenth Judicial Circuit, Henry |
| | ) | County, Illinois, |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04--CF--51 |
| | ) | |
| ANDRES ROA, | ) | Honorable |
| | ) | Larry S. Vandersnick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE, dissenting:

_____

The majority affirms the drug conviction of Andres Roa, rejecting his challenge to the denial of his motion to suppress evidence on the grounds that the interaction following the return of Roa's documents was "consensual." For the reasons that follow, I believe the conviction should be vacated, and the defendant should have a new trial. I, therefore, dissent from the decision affirming his conviction.

### FACTUAL AND PROCEDURAL BACKGROUND

In February 2004, Andres Roa was driving on Interstate 80 in Henry County when he was stopped by Sergeant Floyd Blanks, who testified that, according to radar, defendant was exceeding the speed limit by six miles per hour. After pulling the defendant over, Blanks told him, ostensibly to allay his nervousness, that he was only going to give him a warning ticket.

Roa produced his driver's license, vehicle registration, and proof of insurance. Nothing in the record indicates that this was a rental car or that defendant was otherwise not its owner. Blanks returned to his squad car to check Roa's documents and became determined that, because of the defendant's "extreme" nervousness and the presence of an air freshener in his car, he was going to secure Roa's consent and search his car. At that time he requested assistance from Trooper Clint Thulen.

He returned to the defendant's car. After giving Roa his documents, presumably freeing him to drive off, Blanks stopped him with the command, "wait a minute, Andres," asked him three questions[2] suggesting he believed Roa could be engaged in some criminal conduct, and then requested, and received, consent to search something – Roa says it was only the trunk and Blanks says the vehicle. Although there is some dispute about where Roa was and when the request to search was made relative to the arrival of Trooper Thulen, we accept, as *People v. Collins,* 214 Ill. 2d 206, 217, 824 N.E.2d 262, 267 (2005), requires us to do, the testimony of the two officers that Thulen arrived while Blanks, having secured Roa's consent, was standing near the trunk of defendant's car, preparing to search.

The officers searched the entire vehicle for 20 minutes, finally discovering, with the help of a fiberoptic scope, a hidden compartment near the air bag which contained 11 packages of cocaine, totaling 24.2 pounds. Roa was arrested and charged with one count of possession and two counts of possession with intent to deliver. His defense attorney moved to suppress the drugs, claiming there had been no probable cause for the extended detention of the defendant.

---

[2]Blanks asked Roa if everything in the vehicle belonged to him, whether anyone had asked him to transport anything, and whether there was anything illegal (weapons, alcohol or drugs) in the vehicle.

At the hearing on the motion to suppress, the trial court heard testimony from Sergeant Blanks, Trooper Thulen, and the defendant, after which the court denied the defendant's motion to suppress based on its factual findings that: (1) the defendant was speeding, providing the officer with probable cause for the initial traffic stop; (2) the duration of the traffic stop was reasonable because the officer did not delay unduly in asking for consent to search; and (3) the officer had a reasonable, articulable suspicion that the defendant was engaged in criminal conduct justifying the extended detention.

On the basis of these findings, the drugs that had been found in Roa's vehicle were ruled admissible for trial. The charges were first tried to a jury which deadlocked and was unable to reach a verdict. The State then dropped two of the three counts and the second trial proceeded on the single charge of possession with intent to deliver between 15 and100 grams of a controlled substance. This charge was prosecuted in a bench trial on stipulated evidence. The trial court found defendant guilty and sentenced him to 15 years in the Department of Corrections.

Roa, having properly preserved his issue, filed a timely notice of appeal asserting only that the trial court had erred in denying his motion to suppress the evidence of drugs seized when his vehicle was searched following a traffic stop. This court issued an order finding (1) that the initial traffic stop was proper because there was probable cause to believe that the defendant was speeding; (2) the original stop ended but, because Roa's departure had been halted by the officer's show of authority, there had been a second seizure of the defendant; (3) the second seizure was supported by a reasonable, articulable suspicion that the defendant was engaging in criminal conduct; therefore, (4) the motion to suppress was properly denied and the defendant's

conviction was proper and should be affirmed. Justice Lytton concurred in the result but believed that there had been no second seizure because the extended encounter with the officer had been consensual on the part of the defendant and, therefore, the search of defendant's vehicle was proper and the conviction should be affirmed. I dissented, agreeing with Justice Wright that the initial stop had been proper and that there had been a second seizure, but I would have found that seizure to have been made without a reasonable, articulable suspicion that the defendant was engaged in criminal conduct and that the court's contrary conclusion was against the manifest weight of the evidence. For that reason, I believed the motion to suppress should have been granted and would have reversed the conviction and remanded for a new trial without the seized contraband.

The defendant petitioned for leave to appeal and the supreme court issued a supervisory order – one of several similarly grounded – directing that our earlier decision be vacated and the case reconsidered in light of its recent decision in *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008). We allowed the parties to file supplemental briefs. There is now a new majority opinion finding that the initial traffic stop was proper, there was no second seizure because the encounter following the traffic stop was consensual, the motion to suppress was properly denied, and affirming the conviction. Slip op. at 12.

ANALYSIS

In our reconsideration pursuant to the supervisory order, the fundamental issue in this appeal remains the same: whether the evidence seized during the search of the defendant's vehicle was properly admitted at trial or should have been suppressed.

Both the United States and Illinois Supreme Courts have told us that we review this

question under a two-pronged standard. Our first inquiry is whether the historical factual determinations made by the trial court are supported by the manifest weight of the evidence presented or whether there has been clear error. Our second is a *de novo* review of whether the trial court's ultimate legal ruling concerning suppression is warranted. *Cosby*, 231 Ill. 2d at 271, 898 N.E.2d at 609, citing *People v. Luedemann,* 222 Ill. 2d 530, 542-43, 857 N.E.2d 187 (2006), citing *Ornelas v. United States,* 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). Because of the major change effected by *Cosby*, I will look at the second prong first.

### What does Cosby hold?

In *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008), the Illinois Supreme Court considered -- in the consolidated appeals from the appellate court decisions in *People v. Cosby*, No. 100681, and *People v. Mendoza*, 102584 -- the proper analytical framework for determining whether a prolonged contact following a traffic stop was a consensual encounter or a second seizure. Initially, the court reiterated its earlier holding in *People v. Harris*, 228 Ill. 2d 222, 886 N.E.2d 947 (2008), that, pursuant to *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), a traffic stop could no longer become constitutionally infirm simply because the fundamental nature of the stop had changed. *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. The *Cosby* court thus affirmed that the prong of *People v. Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260 (2003), on which our now-vacated decision in the instant case had rested, is no longer good law. *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612.

The court then set out the analysis for resolving questions about the nature and propriety of a vehicle search and the extended questioning of a motorist who had previously been detained

for a traffic violation.

Noting that the relevant question in Cosby's case was whether Kaus's request to search Cosby's car after the traffic stop had ended constituted a new seizure for fourth amendment purposes, the *Cosby* court analyzed that question "under the principles set forth in *Brownlee[3]* and *Mendenhall[4].*" *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612.

The court then described the stop in *Brownlee*, concluding that the actions of the two officers in standing on either side of (flanking) the car for two minutes without speaking would cause a reasonable person to believe, consistently with *Mendenhall*, she was not free to leave. *Cosby*, 211 Ill. 2d at 277, 898 N.E.2d at 613. Neither the *Brownlee* nor *Cosby* court has equated that conduct to any of the *Mendenhall* factors. *Brownlee* thus holds out the possibility that there *can* be a second seizure even though not one of the *Mendenhall* factors is clearly present.

Indeed, the *Cosby* court stated:

"It is true that the *Mendenhall* factors are not exhaustive and that a seizure may be found on the basis of other coercive police conduct similar to the *Mendenhall* factors." *Cosby*, 231 Ill. 2d at 281, 898 N.E.2d at 615, citing *People v. Luedemann*, 222 Ill. 2d 530, 557, 857 N.E.2d 187 (2006).

The court went on to say, however, that in its decisions in *Luedemann, People v. Murray*, 137 Ill. 2d 382, 560 N.E.2d 309 (1990), and *People v. Smith*, 214 Ill. 2d 338, 353-54, 827 N.E.2d 444 (2005), as had been the case in *Mendenhall* itself, the court "relied on the absence of the

---

[3]*People v. Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556 (1999).

[4]*United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980).

*Mendenhall* factors to conclude that no seizure had taken place." *Cosby*, 231 Ill. 2d at 281.

The court further stated, again citing *Luedemann*:

" 'Even in the absence of cases such as *Mendenhall, Murray,* and *Smith*, it would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. \*\*\* Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner. *Luedemann,* 222 Ill. 2d at 554.' " *Cosby*, 231 Ill. 2d at 281, 898 N.E.2d at 615.

Addressing the totality-of-the-circumstances factor raised by the dissent, the court said:

" 'This court expressly adopted [the *Mendenhall*] factors in *Murray*. The "in view of all the circumstances" language must be read in concert with, not in opposition to, the factors. [Citation] The factors illustrate what type of police conduct would give a reasonable person an objective reason to believe that he or she was not free to leave or was not free to decline an officer's requests.' *Luedemann*, 222 Ill. 2d at 554-55." *Cosby*, 231 Ill. 2d at 282, 989 N.E.2d at 616.

The court then concluded:

"The reality in Cosby's case is that none of the *Mendenhall* factors are present. Therefore, the dissent's insistence that Cosby was seized is not supported by the record." *Cosby*, 231 Ill. 2d at 282, 898 N.E.2d at 616.

-19-

Although this would appear to foreclose any possibility of finding a second seizure unless one of the *Mendenhall* factors is present, the court returned to *Brownlee*, saying:

"In *Brownlee*, after the driver had been handed back his paperwork by one of the two officers and had been told that no ticket would be issued, both officers, who were on opposite sides of the vehicle, stood at their stations, saying nothing. After about two minutes had elapsed, the officer standing next to the driver's door asked for permission to search the vehicle. After asking whether he had a choice, the driver consented. This court held that the officers' actions constituted a show of authority and that a reasonable person in the driver's position would not have felt free to leave. Thus, the driver and his passengers were subjected to a seizure."

*Cosby*, 231 Ill. 2d at 283, 898 N.E.2d at 616.

At no time that I have been able to find has the court ever found that the situation in *Brownlee* involved any of the *Mendenhall* factors. That conclusion was not clearly drawn either in *Brownlee* itself or in *Cosby*.

At the end of its analysis in Cosby's case, the court held that "Cosby was not seized and that his consent to search his car was therefore voluntary." *Cosby*, 231 Ill. 2d at 285, 898 N.E.2d at 617.

Turning then to *Mendoza*, the court stated its intent to "apply the *Brownlee* analysis to Mendoza's appeal." *Cosby,* 231 Ill. 2d at 286, 898 N.E.2d at 618. Having so said, however, the court stated that "[n]one of [the *Mendenhall*] factors are present in Mendoza's case." *Cosby,* 231

Ill. 2d at 287, 898 N.E.2d at 618. The court then reiterated the four factors and tested every fact on which the appellate court had based its decision that Mendoza had been seized for its fit with one of the *Mendenhall* factors. After noting that there were only two officers rather than several, that the guns were not displayed to Mendoza in the way contemplated in *Mendenhall*, that neither officer testified to physically touching Mendoza, and that the record did not suggest that they had spoken to Mendoza in a way suggestive of a requirement of compliance; the court stated: "The absence of all the *Mendenhall* factors *strongly suggests* that Mendoza was not seized for fourth amendment purposes." (Emphasis added.) *Cosby*, 231 Ill. 2d at 287, 898 N.E.2d at 619.

During the course of its opinion, the *Cosby* majority, in responding to the factual and legal challenges raised by the dissent, appeared to refine and clarify its position with respect to the role of the *Mendenhall* factors in the determination of whether a second seizure has occurred following a traffic stop. They have created what appear to be two conclusions: first, that, in the wake of *Cosby*, *Brownlee* remains good law to the extent of its statement of the general legal principle that a person is seized when, in view of all the facts and circumstances, the person would not feel free to leave. *Brownlee*, 186 Ill. 2d at 517, 713 N.E.2d 564.

Second, there now seems to be an almost mandatory *presumption* that a reasonable person would feel he or she was free to leave the scene once a traffic stop has ended unless the police officer engages in the threatening or coercive conduct identified in the four *Mendenhall* factors. Absent that specific conduct, any continuation of the encounter that began with the traffic stop is deemed "consensual."

Put another way, unless several police officers act in a threatening manner, one officer

-21-

waves or points a weapon at the motorist, an officer physically touches the person of the citizen (presumably in a threatening or coercive way), or an officer employs a threatening tone or forgets to smile or sound friendly when he is telling the motorist to wait, or answer questions about criminal activity or give consent to search his vehicle there is no show of authority that would lead a reasonable person to feel he or she was not to leave – a motorist who does not simply get in his car and drive away while the officer is standing by the vehicle talking is remaining voluntarily.

### What is the impact of Cosby on the instant case?

I have no quarrel with the author's review of the extant law relevant to searches during or following traffic stops as most recently interpreted by the Illinois Supreme Court in *Cosby*. I do, however, not agree that *Cosby* requires us to affirm Roa's conviction. I write separately to support that disagreement and to express, respectfully, my belief that *Cosby* is flawed and my hope that the supreme court will consider revisiting that decision.

Pursuant to the supervisory order, we have reconsidered our earlier decision in this case. The majority has clearly read Cosby's legal construct in the same way I have, and has abandoned our earlier majority finding that there had been a second seizure of Roa, and has now found that, since none of the *Mendenhall* factors was present in this case, there was no show of police authority and this was merely a consensual encounter between the officers and Roa. Even without looking beyond *Mendenhall*, however, I believe we must vacate Roa's conviction and remand the case for a new trial for several reasons. Moreover, if, as the *Cosby* court plainly leaves open, there may be, although the possibility is remote, other situations that can create seizures, the majority decision is incomplete because of its total failure to look beyond the

*Mendenhall* factors for evidence of a seizure.

I believe the new majority decision is apparently consistent with those portions of the supreme court's legal analysis in *Cosby* that suggest that, if there are no *Mendenhall* factors, there is no seizure. The majority simply finds that no *Mendenhall* factors are present in this case. I believe the record suggests the possible presence of at least one factor and would reverse for further proceedings to make that determination.

At the time of the hearing on Roa's motion to suppress and of his jury and bench trials, the focus of the defense, the prosecution, and the court was on whether Sergeant Blanks had a reasonable, articulable suspicion that Roa was engaging in criminal conduct when he prolonged the detention after concluding the traffic stop. Prosecuting and defending the charges on this basis was fully supported by viable supreme court authority.

The decision of the trial court was grounded in its determination that the tacitly recognized seizure was proper because, considering the totality of the circumstances, Blanks had a reasonable, articulable suspicion that Roa may have been part of the nation's drug traffic. In our first review, the majority found that there had been a second seizure and the determination of whether the conviction should be affirmed or reversed rested entirely on the existence or absence of that reasonable, articulable suspicion of Roa's wrongdoing. Even though Justice Lytton's special concurrence found the encounter to be consensual, he did so without any citation to *Mendenhall* or analysis of its four factors.

*Cosby* profoundly altered the legal landscape. The supreme court's recognition of that fact is clear in its analysis in the case and is implicit in the number of supervisory orders that were issued directing the appellate court to vacate earlier decisions and reconsider the cases in

-23-

light of its *Cosby* decision. Concepts of fundamental fairness and rudimentary due process would reasonably suggest that cases that were prosecuted, defended, and decided entirely on a legal basis that was sound at the time they were both tried and reviewed by the appellate court, but were subsequently invalidated by the supreme court, should be retried to allow the parties to actually present evidence tailored to the new bases for decision.

I acknowledge that this was not the way in which the supreme court disposed of the appeals of Cosby and Mendoza and recognize that their disposition may authorize us to forego a remand. My concern, however, is that facts which may not have seemed to warrant particular articulation or emphasis under one legal theory may assume far greater importance when proceeding under a different one. In that circumstance, the fact that something does not appear in the record is not dispositive of whether it exists. But even if I am wrong on the basic policy question, I still believe that remand is required in this particular case.

Unlike the situation in *Cosby*, there is something in the Roa record that seems relevant to one of the *Mendenhall* factors and which seems to me to require fleshing out and clarification. Both the officer and the defendant testified that, after he returned Roa's documents and gave him the warning ticket, Blanks said, "wait a minute, Andres." There was no testimony about Blanks' tone of voice, body language or attitude at the time he uttered words that clearly could have been a command. Nor is there any express testimony about the manner in which Blanks asked the three questions that hint of his admitted suspicion of Roa's wrongdoing or asked to search. There *is* Roa's testimony that he thought he had to stay. When asked why, if he had only agreed to tender his trunk, he did not object when the officer proceeded to hit on the passenger door of the car and search under the hood and check inside the engine, he said, "I can say he's the police,

-24-

what can I do? *** You know, I think they are the law, they are the police. You know, I don't want to be in trouble, you know." Because I believe there is enough in the record to suggest that Roa might be able to show the presence of at least one of the *Mendenhall* factors, I would reverse his conviction and remand the case for a new suppression hearing focused on evidence pertinent to those factors.

I believe a fair reading of *Mendenhall* clearly shows that the presence of a single "factor" is sufficient. The *Mendenhall* court stated:

> "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, *or* the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." (Emphasis added.) *Mendenhall*, 446 U.S. at 554-55, 64 L. Ed. 2d at 509-10, 100 S. Ct. at 1877.

Thus, if, upon remand, the court finds the presence of one of the *Mendenhall* factors, the defendant was seized at the time he was questioned and his vehicle was searched. The court would then need to determine whether the seizure was supported by probable cause or reasonable suspicion or was illegal. See *Cosby*, 231 Ill. 2d at 277, 898 N.E.2d at 613.

Should such an analysis be required, the question for the court would be whether, considering the totality of the circumstances, the officer had a reasonable, articulable suspicion that Roa was engaged in criminal conduct. In this court's earlier decision, I concluded that the trial court's finding that Sergeant Blanks had a reasonable, articulable suspicion to believe that Roa was engaged in criminal conduct was against the manifest weight and that the first prong of our standard of review had not, therefore, been met. If this case were remanded – as I think it should be – and if the trial court should find the presence of a *Mendenhall* factor – which I think is possible – the trial court would have to undertake a new analysis of the totality of the circumstances to determine whether Blanks had the requisite reasonable, articulable suspicion. I would still find that, given the totality of the circumstances in this case, a finding that he did would be against the manifest weight of the known facts.

When that analysis was done in the earlier case, there were facts elicited in the examination of Sergeant Blanks which, to my knowledge, have not been available to the court in prior cases and which I believe to be highly relevant.

As judges, we get a false sense of the reliability of the indicators that drug interdiction teams – and police officers generally – use in profiling drivers. The only time these stops come to our attention is when contraband is actually found during a search of the vehicle. It tends to appear, therefore, that the law enforcement officers are right 100% of the time. But Sergeant

Blanks disabused us of that notion in his testimony. The dialog was as follows:

"Q And when you talk about those thousand, roughly a thousand interdiction stops that you've personally made, are those a thousand that have led to the discovery of some sort of contraband, or is that just a thousand stops and then you conducted an investigation and it went one way or another?

"A A thousand that have led to the discovery of some kind of contraband.

"Q OK. How many drug interdiction stops would you say you've made where there's been no discovery?

"A *Two thousand.*

"Q OK.

"A *Minimum.*

"Q *So there are times, and in fact more often than not, if I hear you correctly, where you don't discover something that you think might be there?*

"A *Yes, sir."* (Emphasis added.)

The testimony was that Sergeant Blanks was *wrong* in two out of every three detentions he made and searches he undertook using the factors he enumerated. Stated another way, it is two times more likely that, using Sergeant Blanks' track record as a guide, Roa was innocent of wrongdoing rather than guilty. That hardly supports a conclusion that the factors, singly or in combination, constitute "reasonable" suspicion justifying extending the duration of a minor

traffic stop to the time necessary to conduct a full-blown search for drugs.

It is also worth noting that at least 2,000 innocent motorists were detained and their vehicles were searched to no avail by this one officer alone. If those stops were like this one, the delays were significant and the searches far ranging, including the areas under the hood, in the engine, and behind the airbag.

The trial court made it absolutely clear that its decision that there was a reasonable suspicion of criminal activity was based on Sergeant Blanks' "vast" experience, stating:

> "I have to look at it as an officer with Trooper Blanks' experience would look at it. *** [Blanks] has 17 years of experience or more. It's not like *** somebody that is a rookie that just came on. And I have to look at that. That's the totality of the circumstances. I have a trooper here that has been - has significant training, and I'm well aware [Blanks] has been in court many, many times in these situations, and obviously from his testimony here, [Blanks] knows what he's doing. He can describe the - the scent of - of cocaine. He can describe masking agents and *** he's very well versed in - in cocaine trafficking or in controlled substance trafficking."

But he was, by his own testimony, *wrong more than 67% of the time.* That kind of experience should not inspire much confidence in either the rationality or the predictive ability of the factors on which he has relied for 17 years and on which he teaches others to rely. If you are wrong 67% of the time you rely on innocent conduct, the inevitable and legitimate

question raised is whether those factors can, in and of themselves, constitute reasonable, articulable suspicion of criminal conduct. Surely they cannot.

Taking into account the fact that the trial court could not consider what Blanks found to determine whether he had a reasonable suspicion of criminal activity, there is nothing to show that the trial court made any evaluation of how or why these factors, viewed independently and objectively by the court, were more reliable or reasonable in this case than they were in the more than 2,000 cases in which the officer relying of them was wrong. Indeed, there is no indication that the trial court either acknowledged or considered Sergeant Blanks' admission of significant fallibility. When the trial court and courts of review view the factors allegedly giving rise to an articulable suspicion of criminal activity not objectively but through the lens of the officer's experience, as the trial court and the majority in its earlier decision in this case expressly did, any reasonable assessment of the factors as predictors of criminal activity can only appropriately be done taking his 67% failure rate into consideration..

Again, should such a review be necessary on remand of the case, I believe consideration of this information should be a significant part of the assessment of whether the officer had a suspicion of Roa that was reasonable for two reasons. First, our judicial system promises fair process of the guilty as well as the innocent. That process requires consideration of all relevant factors, not just those that support a finding of guilt. There are at least 2,000 innocent (except of traffic violations) motorists who were stopped in their travels, questioned, and subjected to a search of their vehicles (which, if they were like the ones in this case, consumed quite a bit of time) for no valid reason. Our decisions in these cases affect them every bit as much as they do the defendants in the individual cases. There should be something more than a hunch that causes

them inconvenience.

For all of the foregoing reasons, I dissent.