2017 IL App (3d) 130802

Opinion filed March 23, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Henry County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-13-0802 |
| | ) | Circuit No. 13-CF-78 |
| JOHN F. WEST, | ) | |
| | ) | Honorable Ted J. Hamer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice McDade dissented, with opinion.

**OPINION**

¶ 1     The State charged defendant, John F. West, with cannabis trafficking (720 ILCS 550/5.1(a) (West 2012)), unlawful possession with intent to deliver cannabis (720 ILCS 550/5(g) (West 2012)), and unlawful possession of cannabis (720 ILCS 550/4(g) (West 2012)). Before trial, defendant filed a motion to suppress evidence. He alleged, *inter alia*, that the traffic stop, which led to police finding the evidence used against him, was unreasonably prolonged and his subsequent consent to search was involuntary. The trial court denied defendant's motion and found him guilty of all charges. The trial court sentenced defendant to 12 years' imprisonment and imposed a $3000 drug assessment and an $87,000 street-value fine. Defendant appeals the

trial court's ruling on his motion to suppress and the amount of the street-value fine. He further argues he is entitled to credit for time spent in presentence custody against his fines. We affirm the trial court's ruling on defendant's motion to suppress and find that defendant forfeited his street-value fine argument. We remand this case to the trial court, however, to amend defendant's sentencing order to account for his credit earned during the time he spent in presentence custody.

¶ 2                                                                     FACTS

¶ 3         Illinois State Trooper Jarrod Johnson stopped defendant for speeding (625 ILCS 5/11-601(b) (West 2012)) and not wearing a seat belt (625 ILCS 5/12-603.1(a) (West 2012)) while he was traveling eastbound on Interstate 80. Johnson recorded the traffic stop with the video system in his squad car. He noticed defendant had an Arizona driver's license and asked numerous questions unrelated to the traffic offenses during the encounter. Defendant told Johnson he was driving from Arizona to Flint, Michigan, to visit friends. He said he planned to stay until the end of the week and indicated that he did not know his friends' address in Michigan. Johnson later testified that illegal narcotics suppliers sometimes hold back the precise drop-off location to prevent drivers from cooperating with police in the event they are stopped before delivering the drugs.

¶ 4         Johnson saw that defendant had a suitcase in the backseat, a mechanic's shirt hanging inside the car, and a camera in the rear window. When Johnson asked defendant about the shirt, defendant said he was a mechanic, that business was not going well, and that the trip had already cost him $600. Johnson repeated some of his questions about defendant's travel plans, seeking further clarification. Defendant stated he planned to stay in Flint for three days, leaving on Saturday. They were talking on a Thursday evening at approximately 5:37 p.m.

¶ 5        Johnson asked defendant to sit in his squad car with him while he checked his documents and wrote him a warning ticket. As they walked back to the squad car, Johnson requested a canine officer. After the dispatcher said there were no canine officers available, he requested a backup officer. Johnson later testified that he was suspicious of defendant's inconsistent statements about his travel plans, the fact that his luggage was in the backseat of his vehicle instead of in the trunk, and the mechanic's shirt. He said narcotics smugglers sometimes keep luggage in the backseat of their cars so they can carry contraband in the trunk and hang shirts inside their cars to blend in with average motorists. Johnson further stated he found it odd that defendant said his business was not going well but he was taking a costly trip to visit friends.

¶ 6        While defendant and Johnson were seated in the front seat of the squad car, defendant asked Johnson how long he had been a state trooper and told him about one of his relatives in law enforcement. He also asked Johnson about the local ethanol plant. During this conversation, Johnson checked the validity of defendant's documents and wrote him a warning ticket. Defendant volunteered that he knew from crossing the border into Mexico to visit his deported ex-wife that there was another John West with an arrest warrant. Johnson confirmed that defendant was not the John West described in the arrest warrant. He later testified that he became more suspicious of defendant at this point.

¶ 7        Johnson thought defendant might have been confused. He asked defendant, again, about his travel plans and why he did not fly instead. Johnson later testified that he was asking the travel-related questions to determine if driving to Flint from Arizona made financial sense. While they were still in the patrol car, Johnson asked about the camera in the rear window of defendant's vehicle. Defendant told him the camera belonged to a friend who must have

inadvertently left it in the car. He assured Johnson that the camera was not hooked up to anything in the car or operating.

¶ 8       Approximately 14 minutes after Johnson initiated the stop, he issued defendant a written warning, returned his documents, and told defendant he was "free to go." Defendant exited the squad car. Johnson exited the squad car in quick succession. Roughly 15 to 20 seconds later, Johnson asked defendant if he could ask him a few more questions. Defendant agreed, and Johnson told him to stand by the passenger side of their vehicles, away from passing traffic where he was standing when their conversation began. Defendant responded to Johnson's renewed questions about the camera, his travel plans, and his destination. Johnson also asked defendant whether there was contraband in the vehicle. Defendant said there was none.

¶ 9       Approximately three minutes after Johnson told defendant he was free to leave, he asked defendant for his consent to search the vehicle. Defendant said "yes" and waved his arm toward his vehicle. At this time, a backup officer arrived. Johnson explained the situation to the officer, and defendant confirmed his consent to search. Johnson directed defendant to stand with the backup officer. Several minutes into the search, Johnson noticed duct tape on an interior seam of the front passenger door. Defendant said it was there to keep water out of the vehicle. Johnson read defendant his *Miranda* rights, placed him in the backseat of his squad car, and continued searching the vehicle. After locating bundles of a substance he suspected was cannabis inside the vehicle door, Johnson handcuffed defendant.

¶ 10       In total, Johnson located 12,204 grams of cannabis in 16 bundles wrapped in duct tape hidden in defendant's vehicle doors. Johnson used a field test to positively identify one of the bundles as cannabis. Eight bundles were later tested by the crime laboratory and confirmed to be cannabis. The remaining eight bundles were not tested.

4

¶ 11    The State brought all three charges against defendant. Defendant filed a motion to suppress evidence. At the hearing on defendant's motion, the trial court viewed Johnson's video of the traffic stop, and Johnson testified to the events leading to defendant's arrest. Johnson stated that he did not delay the traffic stop—including writing defendant's warning ticket and verifying his documentation—to engage defendant in conversation. Defense counsel argued the stop was impermissibly prolonged by "drug interdiction" questions unrelated to the purpose of the stop, that Johnson did not have reasonable, articulable suspicion to ask those questions, and that defendant's consent to search his car was merely acquiescence to Johnson's show of authority. Ultimately, the trial court denied defendant's motion. The court found that the traffic stop was not unreasonably prolonged; it ended when defendant was told he was free to leave, and the ensuing encounter was consensual, not coerced.

¶ 12    Defendant elected to proceed with a bench trial. The parties stipulated that, when asked by Johnson about the presence of duct tape in the vehicle, defendant claimed it was there to deflect water; Johnson found 16 duct-taped bundles inside defendant's vehicle doors; Johnson positively identified the substance in one of the bundles as cannabis in a field test; a crime laboratory confirmed that eight of the bundles (5468 grams) contained cannabis; the laboratory did not analyze the contents in the remaining eight bundles (an additional 6736 grams); defendant had a glass pipe in his jacket, which the crime lab later confirmed contained methamphetamine; and defendant made several phone calls from jail indicating he knowingly transported the cannabis at issue for other people. Admitted at trial were the crime lab reports, recordings of defendant's phone calls in jail, and the video recording of the traffic stop. Defense counsel objected to the admission of the phone recordings, the contraband, and the portion of the

5

traffic stop video after Johnson told defendant he was free to leave. The trial court overruled defendant's objections and found him guilty on all three counts.

¶ 13 Defendant moved for a new trial, challenging the trial court's denial of his motion to suppress evidence and the admission of the contraband and phone recordings into evidence. The trial court denied defendant's motion before sentencing. Defendant's presentence investigation report disclosed that he had no history of criminal activity and no prior charges or convictions. The court agreed with the recommendations of the prosecutor and defense attorney and imposed the minimum sentence on defendant allowed, 12 years' imprisonment—reduced by 221 days spent in presentence custody. The trial court also imposed on defendant a $3000 drug assessment and an $87,000 street-value fine for the cannabis.

¶ 14 Defendant appeals.

¶ 15 ANALYSIS

¶ 16 Defendant argues (1) the trial court improperly denied his motion to suppress evidence, (2) his street value fine should be reduced, and (3) his sentencing order should be amended. For the reasons that follow, we reject defendant's first two arguments but remand this matter to the trial court to amend defendant's sentencing order.

¶ 17 I. Defendant's Motion to Suppress

¶ 18 First, defendant argues that the trial court erred in denying his motion to suppress evidence. Specifically, defendant claims the traffic stop was unreasonably prolonged due to numerous "drug interdiction" questions and that his subsequent consent to search was involuntary. He emphasizes that there was no reasonable suspicion or probable cause for his continued detention, resulting in his unlawful seizure before he gave consent to search his car.

6

¶ 19    We review a trial court's ruling on a motion to suppress evidence for clear error, giving due weight to any inferences drawn from those facts by the fact finder. *People v. Harris*, 228 Ill. 2d 222, 230 (2008); *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). The ultimate decision of whether the evidence should be suppressed, however, we review *de novo*. *Id.* The trial court did not err in denying defendant's motion to suppress evidence.

¶ 20    From the outset, we note that we need not address whether Johnson had reasonable, articulable suspicion to detain the defendant. Defendant does not argue Johnson did not have probable cause to initiate the traffic stop. Johnson ultimately decided he did not have reasonable, articulable suspicion sufficient to prolong the traffic stop and ended it. Armed with the knowledge that he was free to leave, defendant twice consented to the trooper's request for permission to search the car. As such, contrary to the defendant's claim, *Rodriguez* is inapposite. *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1613 (2015). The defendant in *Rodriguez* was held after a traffic stop concluded *without* reasonable articulable suspicion in spite of the fact that he refused to consent to a search. *Id.* Reasonable, articulable suspicion has no place in an analysis of this case.

¶ 21    Defendant presented no evidence at trial that the traffic stop was prolonged. Johnson's testimony and the video footage of the traffic stop established the opposite. He did not cease working on the traffic stop while engaging defendant in conversation. The defendant points to nothing in the record suggesting otherwise. Even assuming, for sake of argument, the traffic stop was unreasonably prolonged by Johnson's questions, the defendant's point is irrelevant.

¶ 22    The traffic stop ended *before* defendant consented to a search of his vehicle. The State need only prove defendant's consent to search was voluntary by a preponderance of the evidence. *People v. Casazza*, 144 Ill. 2d 414, 417 (1991); *People v. Branham*, 137 Ill. App. 3d

7

896, 900 (1985). The trial court's determination of the voluntariness of consent to search will be accepted on review unless plainly unreasonable. *People v. DeMorrow*, 59 Ill. 2d 352, 358 (1974).

¶ 23    Johnson concluded the traffic stop by returning documents to the defendant, along with a written warning, and telling him he was free to leave. He told defendant to have a "nice trip," they shook hands, and they remarked that it was nice meeting each other. Defendant exited Johnson's squad car with his paperwork and began walking back to his car. Before defendant got back into his car, Johnson *asked* defendant if he could talk with him further. Defendant agreed to do so. Thereafter, he voluntarily remained outside of his car and engaged Johnson in conversation.

¶ 24    "Generally, a [valid] traffic stop ends when the paperwork of the driver and any passengers has been returned to them and the purpose of the stop has been resolved." *People v. Leach*, 2011 IL App (4th) 100542, ¶ 12 (citing *Cosby*, 231 Ill. 2d at 276). There is no seizure if the motorist understands that he or she is free to leave and voluntarily prolongs the contact. See *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Cosby*, 231 Ill. 2d at 283-85.

¶ 25    The evidence at issue was discovered during a consensual encounter preceded by a traffic stop. Defendant was unequivocally told he was free to leave. He remained on the side of the road and eventually consented—twice—allowing Johnson to search his vehicle.

¶ 26    An officer may convert a lawful traffic stop into a consensual encounter by returning the driver's documentation and informing the driver that he or she is free to leave. *Cosby*, 231 Ill. 2d at 276-79. The encounter can become a seizure, however, if, *inter alia*, the *Mendenhall* factors are present. *Id.* at 277-88 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), and *People v. Brownlee*, 186 Ill. 2d 501, 520-21 (1999)). In this case, none of the *Mendenhall* factors are present in the alleged seizure before or after the traffic stop. Defendant gave his consent, not

8

once, but twice after Johnson explicitly told him he was free to leave. There is nothing plainly unreasonable about the trial court's finding. As such, we affirm the trial court's denial of defendant's motion to suppress.

¶ 27                    II. Defendant's Street-Value Fine

¶ 28        Defendant also argues he is entitled to a reduction in the street-value fine the trial court imposed upon him. Defendant did not object to the fine at sentencing or in a postsentencing motion. As such, he forfeited any related arguments. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant contends that his forfeiture is subject to plain-error review. Without error, there can be no plain error. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008); *People v. Kiefel*, 2013 IL App (3d) 110402, ¶ 17. A street-value fine based on the entire weight of suspected illegal narcotics can be imposed on a defendant regardless of how much was tested. *People v. Nixon*, 278 Ill. App. 3d 453, 459 (1996). Ergo, plain error does not apply. Defendant forfeited this argument.

¶ 29                    III. Defendant's Sentencing Order

¶ 30        Lastly, defendant asserts that he is entitled to a $5-per-day credit for the 221 days he spent in presentence custody toward the fines imposed on him at sentencing. The State concedes this issue. Pursuant to section 110-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14 (West 2012)), defendant is entitled to $1105 credit toward his fines. *People v. Williams*, 2011 IL App (3d) 100142, ¶ 6; see also *People v. Brown*, 2012 IL App (2d) 110640, ¶¶ 30-31; *People v. Maldonado*, 386 Ill. App. 3d 964, 981 (2008). Accordingly, we remand this matter to the trial court to amend defendant's sentencing order in a manner consistent with this court's finding.

¶ 31                            CONCLUSION

9

¶ 32        For the foregoing reasons, we affirm in part, reverse in part, and remand the cause to the circuit court of Henry County.

¶ 33        Affirmed in part, reversed in part, and remanded.

¶ 34        JUSTICE McDADE, dissenting.

¶ 35        John West filed a motion to quash arrest and suppress evidence in which he alleged that he was stopped for speeding, he was unlawfully detained at the time he gave consent to search his car, the consent was not voluntary, the traffic stop was unreasonably prolonged, and there was no reasonable suspicion or probable cause for the continued detention. The majority has found that none of these claims has merit and has affirmed his conviction and the resulting 12-year sentence with appropriate credit ordered. The stated basis for that decision is that the stop ended when the trooper who had pulled him over returned his documents and told him he was free to go and everything that followed was a consensual encounter. For the reasons that follow, I would find merit in each of the claims raised by West and would reverse the denial of the motion to quash and suppress and would reverse his conviction outright.

¶ 36        On March 14, 2013, at about 5:30 p.m., state trooper Jarrod Johnson was traveling west on I-80 when he turned around at mile marker 29 to begin pursuit of a red vehicle traveling east on I-80 at a speed considerably faster than the posted speed limit. He gave chase but, unable to catch up with the red vehicle, Johnson let that person go and turned his attention to a green vehicle that also appeared to be exceeding the limit but at a more sedate, catchable speed. West was the driver and sole occupant of that vehicle. Johnson initially "paced" West using his speedometer and then activated his radar. He determined that West was driving at a speed of 73 miles per hour in a 65-mile-per-hour zone and was not wearing his seat belt. Johnson activated his video and pulled him over.

10

¶ 37 West's conduct violated two sections of the Illinois Vehicle Code, and Johnson's stop was proper. West promptly acknowledged his wrongdoing, evidencing neither resistance nor hostility, and produced the valid identification Johnson requested—driver's license, vehicle registration, and proof of insurance. At no time has West contested the propriety of the stop, and he does not do so now.

¶ 38 Johnson, in sworn testimony, stated that he did not see or smell anything suggesting the presence of cannabis or any other contraband at any time during the stop. He did, however, note that West gave him an Arizona license, had a shirt hanging on a hanger above the car door, and had put his suitcase on the back seat.

¶ 39 Johnson asked 36 to 39 questions that West has characterized, without any real challenge from the State, as "drug interdiction" questions. Although he later tendered several justifications for the questioning, which I will discuss below, it was also Johnson's sworn testimony that he almost always asks these questions—these "drug interdiction questions"—when he makes a traffic stop.

¶ 40 After gathering West's documents, Johnson escorted him to the squad car. On the way, motivated solely by suspicions generated by observations and conclusions wholly irrelevant to the traffic stop, Johnson sought, initially, a drug dog and, upon being told none was available, then asked for a backup officer. He later testified that this subsequent request was to ensure another officer was present should his suspicions not be dispelled during the remainder of the traffic stop. In other words, he wanted a backup officer there with him if he did a search.

¶ 41 When West and Johnson were finally seated in the squad car, West, in an apparent spate of nervous chatter, told Johnson a story about one of his relatives and also asked about the local ethanol plant. As this conversation was occurring, Johnson checked the validity of West's

11

documents and looked for any outstanding warrants. West had volunteered that he knew, because of many border crossings into Mexico to visit his deported ex-wife, that there was another John West who was a wanted man. When information about the other John West appeared on his computer, Johnson reviewed the descriptors more carefully and confirmed that West was not the described fugitive. However, because West was *aware* of the fugitive, Johnson became even more suspicious and wondered if West had his driver's license run often.

¶ 42     Johnson asked West yet again about his travel plans and why he did not just fly. He testified that he did this to confirm what West was saying because he seemed confused. He said that the questions were relevant, not to the traffic offense but, rather, to see if driving made financial sense and if it did not, then it might be suspicious. He also stated that narcotics suppliers sometimes hold back the precise drop-off location to prevent drivers from cooperating with police in the event they are stopped before delivering the drugs. Contrary to this testimony, however, Johnson also claimed that his questions were really only a part of general conversation. While they were still in the patrol car, Johnson asked about a camera he had noticed in the rear window of the other vehicle. West told him that the camera belonged to a friend who must have inadvertently left it in the car. He assured Johnson that the camera was not hooked up or operating.

¶ 43     At about 14 minutes into the stop, Johnson issued West a warning citation, returned his documents, shook his hand, and told him he was "free to go." Johnson did not remain in the squad car and drive off. Instead he exited it at the same time as West and roughly 15 to 20 seconds later asked West if he could ask him a few more questions. West agreed and was directed by Johnson to stand by the passenger side front fender of the police car. West responded to Johnson's *renewed* questions regarding the camera in the back of the vehicle, his travel plans,

his travel schedule, and his destination. He was also asked new questions about whether there was contraband in the vehicle. West pulled the camera out of the back window to show Johnson that it was not connected. He also denied the presence of contraband.

¶ 44    At a little more than 17 minutes after West was stopped, Johnson asked him if he could search his vehicle. Johnson testified that he did not draw his weapon or use a threatening voice when asking for this consent. West said "yes" and waved his arms in a welcoming gesture. At this time the backup, Officer Hampton, arrived on the scene, and Johnson explained the situation to him. At Johnson's request, West confirmed his consent. Johnson directed him to move over by Hampton. The officers began to search the vehicle. Several minutes into the search, Johnson noticed duct tape on one of the doors and questioned West about it and was told that it was being used to keep water out of the vehicle. Johnson then read West his *Miranda* rights and placed him in the backseat of his squad car, and the two officers continued their search of the vehicle. After 16 bundles of a substance the officers believed to be cannabis were found inside the vehicle doors, West was handcuffed.

¶ 45    At the hearing on West's motion to quash and suppress, defense counsel argued that the stop was impermissibly prolonged by "drug interdiction" questions unrelated to the purpose of the stop, that Johnson did not have reasonable, articulable suspicion to ask those questions, and that West's consent to the search of the car was merely acquiescence to Johnson's continued show of authority. The State argued that the stop was not unreasonably prolonged, that a reasonable person would have believed he was free to leave when Johnson returned his documents and told him he could leave, and that West's consent to the search of his vehicle was given voluntarily. The trial court took the matter under advisement.

13

¶ 46 The trial court subsequently denied West's motion, reasoning that there was probable cause for the traffic stop and that the stop was not unreasonably prolonged even though Johnson asked West "drug interdiction" questions. The court found that the stop ended when West was told he was free to leave and that the ensuing encounter was consensual and not coerced.

¶ 47 A bench trial was conducted after West waived his right to a jury. He preserved the issues raised in his motion to quash arrest and suppress evidence through objections during trial and in his posttrial motion. He was ultimately found guilty of all three charged offenses.

¶ 48 The presentence investigation disclosed that West had no history of criminal activity and no prior charges or convictions. The court agreed with the recommendations of the prosecutor and defense attorney and imposed the minimum sentence allowed—12 years' imprisonment— reduced by 221 days spent in presentence custody. A $3000 drug assessment and an $87,000 street-value fine for the cannabis were imposed.

¶ 49 In this appeal, West has presented three arguments, the first of which is that his motion to quash arrest and suppress evidence was improperly denied because his traffic stop was unreasonably prolonged and the subsequent "consent" to the search of his vehicle was mere acquiescence and, therefore, involuntary. Because I believe that argument is correct and dispositive, it is the only one addressed in this dissent. I find the facts of record in this case lead logically and inexorably to the following conclusions that are diametrically opposite to those reached by the majority: (1) the stop did not end when West was told he was free to go, and (2) his consent to the search was not voluntary.

¶ 50 The fourth amendment to the United States Constitution, which is applicable to the states through the fourteenth amendment, prohibits the federal government and, by extension, the states, from violating the innate individual rights of the people to be free from unreasonable

14

searches and seizures. U.S. Const., amends. IV, XIV. A seizure of a person within the context of the fourth amendment occurs " 'if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *People v. Brownlee*, 186 Ill. 2d 501, 517 (1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

¶ 51 In *Terry v. Ohio*, 392 U.S. 1, 18-19 (1968), the Supreme Court outlined the appropriate analysis to be used by courts in assessing the reasonableness of brief police investigatory stops, which have been found to include searches and seizures in conjunction with traffic stops. The analysis requires a "dual inquiry," first, asking whether the stop was justified at its inception and, second, whether the officer's actions during the course of the stop were reasonably related to the scope of the circumstances that initially justified the stop. *Id*. at 19-20. " 'A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the constitution.' " *People v. Harris*, 228 Ill. 2d 222, 235 (2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

¶ 52 Illinois case law holds that the allowable scope of a stop is exceeded if the detention was impermissibly prolonged or if the police conduct itself violated the person's " 'constitutionally protected interest in privacy.' " *People v. Baldwin*, 388 Ill. App. 3d 1028, 1033 (2009) (quoting *Caballes*, 543 U.S. at 408).[1] If either principle is violated by the officer, a separate fourth amendment justification must be present, or the seizure is rendered unlawful, and evidence gained pursuant to that search becomes the unusable fruit of a poisonous tree. *Id.* at 1033; *People v. McCauley*, 163 Ill. 2d 414, 448 (1994). Such alleged fourth amendment violations ancillary to justified stops are, however, deemed meritless if the individual is found to have voluntarily submitted to the otherwise unlawful seizure and search. *Harris*, 228 Ill. 2d at 249. A "contextual,

[1]The Illinois Supreme Court has held that merely showing a change in the fundamental purpose of the stop does not constitute an impermissible extension. See *Harris*, 228 Ill. 2d at 244.

totality of the circumstances analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop" should be employed to assess whether the officer's actions during the stop are reasonably related to the circumstances that justified the stop. *Baldwin*, 388 Ill. App. 3d at 1034.

¶ 53 In this case, West was stopped for speeding (625 ILCS 5/11-601(b) (West 2012)) and failure to wear a seat belt (625 ILCS 5/12-603.1(a) (West 2012)). Because those are actionable traffic offenses, the stop was justified at its inception. See *Baldwin*, 388 Ill. App. 3d at 1032 (holding that "a traffic violation constitutes probable cause and satisfies *Terry's* first prong"). West does not challenge the validity of the stop at its inception.

¶ 54 With respect to the second *Terry* prong, this court must consider whether Johnson's actions during the course of the stop were reasonably related to the violations that initially justified the stop (*Terry*, 392 U.S. at 19-20) or whether the manner of executing the stop unreasonably infringed West's constitutionally protected interests. *Harris*, 228 Ill. 3d at 234. That consideration implicates three questions: (1) whether the stop—up to the time West was given his documents and told he was free to go—was unduly prolonged by Johnson's questions and conduct; (2) whether the stop was prolonged beyond the return of West's documents by means of physical force or a show of authority by Johnson, creating for West a reasonable belief that he was not free to leave and negating his consent to search; and (3) whether Johnson had a reasonable, articulable, and individualized suspicion that West was committing or was about to commit a crime *other than his traffic violations* sufficient to justify any prolonged or second seizure that may have occurred.

¶ 55 The United States Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015), is instructive here. The court stated:

16

"We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation. [*Illinois v. Caballes*, 543 U.S. 405, 407 (2005)]. The Court so recognized in *Caballes*, and we adhere to the line drawn in that case." *Id.* at ___, 135 S. Ct. at 1612.

¶ 56    The Court had granted certiorari in *Rodriguez* to address and resolve conflicting decisions in lower courts on "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. [Citations.]" *Id.* at ___, 135 S. Ct. at 1614. The conflicting lower court positions were (a) "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only *de minimis* intrusions" (*United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006)), and (b) "without additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded" (*State v. Baker*, 2010 UT 18, ¶ 13). *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1613-14. The *Rodriguez* court rejected the *de minimis* position, vacated the judgment of the Eighth Circuit Court of Appeals and remanded the case for that court to review the district court's finding that the dog sniff "was not independently supported by individualized suspicion." *Id.* at ___, 135 S. Ct. at 1616-17. The court validated the position that "[w]ithout additional reasonable suspicion, the officer must allow the seized person

17

to depart once the purpose of the stop has concluded." (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1614.

¶ 57    Both *Caballes* and *Rodriguez* were dog sniff cases and the instant case, because Johnson's request for a canine officer was thwarted, is not. There is, however, nothing in the *Rodriguez* court's analysis that states or suggests that either the fourth amendment principles in which its analysis is grounded or the fourth amendment conclusions that it reached are restricted to the post-completion dog sniff context. The Court characterized the dog sniff simply as "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' [Citations.]" *Id.* at ___, 135 S. Ct. at 1615.

¶ 58    The Court began with the premise that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop [citation] and attend to related safety concerns [citations]. Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' [Citations.]" *Id.* at ___, 135 S. Ct. at 1614.

¶ 59    The court then further defined the "mission": "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' [Citation.]. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Citations.] These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. [Citations.]." *Id.* at ___, 135 S. Ct. at 1615.

¶ 60    *Rodriguez* acknowledged the conclusions in *Caballes* and *Arizona v. Johnson*, 555 U.S. 323 (2009), that the fourth amendment "tolerated certain unrelated investigations that did not

18

lengthen the roadside detention," but emphasized that "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' " *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614-15 (quoting *Johnson*, 555 U.S. at 333). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to Justice Alito's suggestion [in his dissent] [citation], he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at ___, 135 S. Ct. at 1615. The stop must be completed expeditiously and without measureable delay.

¶ 61                                    Duration of the Stop

¶ 62        With these applicable fourth amendment principles in mind, I consider first whether the period of time between the inception of the stop and the return of West's documents and his verbal release was prolonged beyond that reasonably necessary to complete its purpose.

¶ 63        Johnson stopped West for two traffic violations. West did not deny committing the infractions, did produce all of the documents requested by Johnson, and did not exhibit any ill will or hostility toward the trooper. All of West's documents checked out as valid and he was issued only a warning ticket. There were, quite simply, no factual or legal complications intrinsic to the purpose of this stop. West and the State agree that the duration of the initial stop was 14 minutes.

¶ 64        The State argues that the stop of West was not unduly prolonged, however, because Johnson testified that virtually all of his stops typically last 14-15 minutes. That claim is not dispositive of the outcome here. It may indicate only that Johnson routinely bombards the drivers he stops with irrelevant and intrusive questions. Indeed, Johnson testified that he asks the same questions of most people he stops even if he is not suspicious. The fact that all of *Johnson's*

19

stops average 14-15 minutes does not prove that that is a reasonable duration for an uncontested and uncomplicated detention.

¶ 65    Specific to his stop of West, there is no dispute that Johnson asked West 36-39 questions that West characterized as drug interdiction questions. The trial court appears to have agreed with that description. These questions were repetitive, intrusive, and totally unrelated to the traffic violations for which West was stopped. Johnson, by his own testimony, found his suspicions were escalating because of West's answers. He doubled back with increasingly less relevant follow-up questions. His overall conduct included a time lag between securing West's license and registration and asking for his proof of insurance and another lag asking more questions before heading for his squad car to verify the documents and write the warning ticket. He created still more delay by having West go with him to the squad car and sit with him while he wrote out the ticket.

¶ 66    Neither West nor the State has specifically addressed the impact of moving West to the squad car in an assessment of whether the stop was unduly prolonged. However, the *Rodriguez* court, in considering and rejecting the line of conflicting decisions espousing the position that *de minimis* intrusions lack constitutional significance, observed that the Eighth Circuit Court of Appeals had emphasized that the delay occasioned by asking a defendant driver or passenger to exit the car for purposes of officer safety was *de minimis*, thereby acknowledging that there was a delay. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. It noted that the "the government's officer safety interest stems from the mission of the stop itself. Traffic stops are especially fraught with danger to police officers [citation], so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. [Citation.] On-scene investigation into other crimes, however, detours from that mission." *Id.* at ___, 135 S. Ct. at

20

1616. In the instant case, such a delay lacks any justification because Johnson did not testify or otherwise indicate at any time that he thought West posed a threat to his safety.

¶ 67 Except for asking for his driver's license and registration and, after some slight delay, his proof of insurance, none of the questions asked by Johnson had anything to do with traffic violations that West did not challenge and a stop that could fairly be characterized as ordinary and routine. Johnson could have left West in his own car, taken West's documents to his squad car, and run the documents; when they came back clean, as they did, he could have let West go on his way. Instead, the initial irrelevant questions and Johnson's "suspicions" generated additional and increasingly irrelevant and intrusive follow-up questions that yielded answers by West that Johnson found personally unsatisfactory. Johnson then had West get out of his car to go and sit in the front passenger seat of Johnson's squad car even though West did not exhibit any threat to Johnson's safety or appear to be a flight risk. On the way to the car, Johnson took the time to call for a drug dog, get a response that none was available, and request a back-up officer. I would find that the extended questioning, the removal of West from his own car to Johnson's squad car, the discussion in the car, and the more careful scrutiny of the information of "the other John West" necessarily caused at least a *de minimis* extension of this otherwise routine stop.

¶ 68 I next consider whether the original stop actually continued even after Johnson gave West the warning ticket, returned his documents, and told him he was "free to go." I believe that it did.

¶ 69 "Generally, a [valid] traffic stop ends when the paperwork of the driver and any passenger has been returned to them and the purpose of the stop has been resolved." *People v. Leach*, 2011 IL App (4th) 100542, ¶ 12; see also *Cosby*, 231 Ill. 2d at 276. If the encounter continues, Illinois law recognizes at least three possible reasons: (1) the motorist understands and

21

accepts that he or she is free to leave and voluntarily prolongs the contact (see *Bostick*, 501 U.S. at 434; see also *Cosby*, 231 Ill. 2d at 283-85); (2) because of some non-forcible show of authority of the officer(s), the motorist reasonably believes that, although the stop is ostensibly over, it is not actually over and he or she is not free to leave (*People v. Bunch*, 207 Ill. 2d 7, 19-20 (2003); *Brownlee*, 186 Ill. 2d at 520-21); or (3) a show of force by the officers causes the motorist to reasonably conclude he is not free to leave, resulting in a second seizure (*Mendenhall*, 446 U.S. at 554; *People v. Luedemann*, 222 Ill. 2d 530, 553 (2006)).

¶ 70       Curiously the majority has concluded that West—who knew he had 16 bags of cannabis secretly stashed in his car doors and whose spotless criminal history insulated him from a charge that he was a crafty, experienced drug runner—voluntarily hung around on the side of the road to chat some more with a law enforcement officer who had shaken his hand and told him unequivocally that he was free to go. For the reasons that follow, I believe the more realistic and tenable conclusion is that any reasonable person, evaluating the totality of these circumstances, would have realized that the stop had not ended and would have concluded, despite Johnson's representations to the contrary, that he or she was not free to leave.

¶ 71       Here, Johnson pulled West over on the side of the interstate, asked him redundant and irrelevant questions about his travels at the stop's inception and during the time West was being detained in Johnson's squad car, issued West a warning ticket, and told him he was "free to go." Within mere seconds of West's supposed "release" and his exit from the squad car, Johnson also got out of the car and asked West if he could ask him more questions. The questions Johnson asked, however, were essentially the same questions West had already answered multiple times. Specifically, he reviewed West's itinerary, schedule, and destination and asked him again why he had a camera in the back window of his car. West reiterated that it had been left in there by

22

another person and pulled out the camera to demonstrate that it was inoperable. Johnson's nearly seamless repetition of questions he had asked West just prior to returning his documents and telling him he could leave was a clear showing of his continued exercise of authority. Although he took the actions and parroted the words that courts have found to indicate the conclusion of a stop, it is evident from Johnson's conduct that those actions and words were mere formalities, empty gestures. Johnson continued to question West just as he had before telling him he was free to leave, asked to search his car, and directed him where to stand both before and after the back-up officer arrived. I would reiterate in this portion of my argument that while Johnson and West were walking to the squad car, Johnson made a radio call to the dispatcher for first a K-9 officer for a dog sniff and when one was not available, a second officer for back-up. It is a fair inference that West was aware of those requests and would reasonably believe that Johnson intended to keep him at the scene until the second officer arrived and a search could be conducted.

¶ 72    No reasonable person, privy and subject to Johnson's actions, would believe that he or she actually had a right to discontinue the interaction with the officer and to leave. For these reasons, I would find that despite the return of his documents and Johnson's statement to West that he was free to leave, Johnson's conduct gave rise to an objectively reasonable belief that the stop had not ended and West was not, in fact, "free to go."[2] West then merely submitted to Johnson's continuing show of authority and involuntarily remained at the scene to reiterate his prior answers to the officer's same questions. I would, therefore, find that the stop did not end

---

[2]Although I believe the facts of this case lend themselves to an alternate finding that a "second seizure" occurred, I have not chosen to analyze it in that way. In *Brownlee*, the supreme court looked specifically at the fact that the two officers paused for nearly two minutes after returning the driver's documents and advising him that no citation would be issued before asking for consent to search his vehicle. *Brownlee*, 186 Ill. 2d at 520. It found that in just those two minutes the officers had "restrained the movements of the car's occupants by their show of authority." *Id.* In the instant case, because the resumption of questioning was nearly instantaneous, I believe that, despite the return of West's documents and Johnson's use of the "magic words," an objectively reasonable person would not believe that the stop had ended.

23

and that West's "consent" to Johnson's request to search was, in reality, mere acquiescence. See *People v. Anthony*, 198 Ill. 2d 194, 202-03 (2001) (finding acquiescence to a show of authority is not consent).

¶ 73                                  Fourth Amendment Justification

¶ 74        Whether (1) the portion of the stop up to the return of West's documents was modestly extended or (2) the stop did not end until West's arrest and was, therefore, significantly extended, *Rodriguez* informs us that the traffic stop has been unconstitutionally prolonged "absent the reasonable suspicion [that the defendant has committed, or is about to commit a *different* crime] ordinarily demanded to justify detaining an individual." (Emphasis added.) *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615.

¶ 75        I, therefore, consider whether the suspicions identified by Johnson to explain his prolonging of the traffic stop sufficiently satisfy the fourth amendment to constitute justification for detaining West " 'beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at ___, 135 S. Ct. at 1612 (quoting *Caballes*, 543 U.S. at 407). I believe they do not.

¶ 76        In *Rodriguez*, the Supreme Court remanded the case to the Eighth Circuit Court of Appeals to review the trial court's determination that, although there was not a reasonable, articulable suspicion to justify the prolonged stop, the dog sniff was acceptable because the intrusion was *de minimis*. *Id*. at ___, 135 S. Ct. at 1616-17. In the instant case, the trial judge ruled that the stop was not unreasonably prolonged despite the "interdiction questions," that it ended when West's documents were returned, and that the ensuing encounter was consensual. Because of that conclusion, the court made no finding of whether Johnson had a reasonable, articulable suspicion. I believe that in its *de novo* review of whether the evidence should have

24

been suppressed and exercising the authority granted us in Rule 366(a)(5) to "enter any judgment and make any order that ought to have been given or made," this court can consider and resolve the undecided issue. Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). For the following reasons, I would find there was no qualifying suspicion.

¶ 77    At no time during the stop did Johnson see or smell anything indicating the presence of cannabis or any other contraband.

¶ 78    Upon noticing that West's driver's license had been issued in Arizona, Johnson began asking West questions that were unrelated to the traffic violations for which he was stopped but which evidenced, by his own testimony, his suspicion that West might be in possession of contraband. The stop was made on I-80, an interstate highway that covers roughly 2900 miles from Teaneck, New Jersey, to San Francisco, California. On its route, it intersects with nine other major interstate highways. Finding a driver on I-80 in possession of a driver's license from Arizona or any other state should not reasonably raise any suspicion.

¶ 79    Johnson persisted in this questioning briefly before asking West for proof of insurance. Although there was no actual evidence of unlawful drug activity, his suspicions were excited by West's Arizona license, a pressed mechanic's shirt hanging above the rear car door, and a suitcase on the back seat of the car. After getting answers to some of his questions, his suspicions were heightened by West's allegedly inconsistent travel plans, his inability to provide the actual address of the person he was visiting, and the financial improvidence of his having embarked on the trip at all. Johnson also found suggestive of a criminal history or criminal purpose that West was aware of another John West, who was wanted for arrest. None of these concerns is related to the traffic violations or provides a reasonable basis for suspicion of West. See *City of*

25

*Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) (requiring *individualized* suspicion before the ordinary enterprise of investigating a crime).

¶ 80    With regard to the shirt, Johnson testified that it was suspicious because drug runners hang them on the door "*to blend with the average motorist.*" This admittedly routine practice by the average motorist of hanging clothes above the door on the inside of the car is facilitated by automobile manufacturers who install hooks over the back doors in their vehicles for that very purpose. Similarly, many motorists put their suitcases on the backseat for a variety of legitimate reasons: convenience, ease of accessibility, and the trunk being filled with something that is *not* contraband, to name but a few. In addition, saying that a trip is three days and that he intends to return at the end of the week and then clarifying that it is Thursday through Saturday (three days, two of which may be travel days) is not "inconsistent," and a simple glance at a calendar will confirm that Saturday is indeed the end of the week. Also, in these days when few people correspond and many navigate by global positioning systems (GPS), failing to have the actual address of your destination on the tip of your tongue is not inherently suspicious. Finally, people make personal financial decisions every day that someone else might think unwise. Indeed, they may actually *be* unwise. More importantly, however, judging the wisdom or foolishness of motorists' personal choices on how to use their money is not a right given to police officers engaged in traffic enforcement and is a wholly unwarranted invasion of personal privacy. Moreover, making unwise financial decisions is certainly not peculiar to drug mules, nor does such a decision give rise to a reasonable suspicion that a person is involved in the commission of a crime. These "suspicions" are nothing more than hunches, and they cannot satisfy the fourth amendment.

26

¶ 81 Regarding the question Johnson asked about the camera after returning West's documents and issuing him a warning citation, West, as evidenced by the video recording, had already explained the reason the camera was in the back window of his car and had told and shown Johnson that it was not operating. Notably, the State fails to identify any case law in which possession of such an item or its location in a vehicle is indicative of illegal activity. Moreover, it can be reasonably inferred from Johnson's own testimony that his repetition of this and other questions was simply a ploy to stop West from leaving before the second officer arrived, just as the officer in *Cosby* waited several minutes until the second officer arrived. See *Cosby*, 231 Ill. 2d at 302-03 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride and Burke, JJ.).

¶ 82 Realistically, the same "suspicions" articulated by Johnson could lead to prolonged detention of numerous totally innocent motorists. Those "suspicions" cannot reasonably support either prolonging the stop or a subsequent search. See *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616-17.

¶ 83 In addition, all of these asserted indicia of suspicion were observed, and Johnson's questioning of West about them occurred, prior to the time he stated that West was free to go. Johnson did not testify to, and the State did not identify, any new or additional bases for suspicion other than those I have concluded were unreasonable. The video recording also does not show West doing anything suspicious between Johnson telling him he is "free to go" and then almost simultaneously asking him if he could question him further. I can certainly reasonably infer that those previously observed suspicions must have been dispelled as Johnson still technically ended the stop by returning West his information and telling him he was "free to go." More significantly, Johnson testified *under oath* that he would have let West go if he had

declined to answer any additional questions. I can only conclude that even Johnson knew that his suspicions were insufficient under the fourth amendment to hold West.

¶ 84       Although drugs were eventually found in the vehicle, an objective review of the totality of the circumstances unfolding during this traffic stop leads necessarily to the conclusion that, because the detention was unjustifiably prolonged due to Johnson's continuous show of authority, West did not voluntarily consent but merely acquiesced to Johnson's additional questioning and the search of his vehicle. See *Anthony*, 198 Ill. 2d at 202-03 (finding acquiescence to a show of authority is not consent.) Because I would find the arrest should have been quashed and the evidence suppressed, I do not, as the majority has done, reach the two challenges to his fines raised by West in this appeal

¶ 85                                    CONCLUSION

¶ 86       I have dissented in this case because I believe the facts, viewed in the context of existing law, warrant a reversal of the trial court's decision denying West's motion to suppress.

¶ 87       Beyond that, the plain message of *Rodriguez* is that traffic stops are for the purpose of enforcing the traffic laws for the safety of persons driving on public streets, roads, and highways. If an officer involved in such a stop is confronted with *evidence* of unrelated actual or impending criminal activity, he or she is justified in extending the stop to investigate further. The corollary of that message is that traffic stops should not be either subterfuge or a substitute for appropriate and effective investigation of drug trafficking. I certainly do not condone West's apparently unprecedented deviation from the straight and narrow path of the law-abiding citizen. However, it seems clear to me that this particular traffic stop ran afoul of both prongs of the Supreme Court's caveat in *Rodriguez* and the evidence found during the search could not properly be used against him at trial. His conviction should be reversed, and he should have a new trial.

28