**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 200214-U

Order filed April 29, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0214 Circuit No. 10-CF-6 |
| ISMAEL J. ACOSTA, | ) ) ) | Honorable Gregory G. Chickris, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON[1] delivered the judgment of the court.
Justice Hettel concurred in the judgment.
Presiding Justice McDade specially concurred.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not err in denying defendant's motion to suppress evidence.

_____

[1]This case was administratively reassigned to Justice Peterson for authorship on August 8, 2022. Justice Peterson has read the briefs and listened to the recording of the oral argument in this matter.

¶ 2    Defendant, Ismael J. Acosta, appeals from the Henry County circuit court's denial of his motion to suppress evidence seized during a traffic stop, arguing the trial court erred in finding the traffic stop was not unreasonably prolonged. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On January 5, 2010, defendant was charged by information with count I, Class X felony cannabis trafficking of more than 5000 grams of a substance containing cannabis with the intent to deliver it, and two lesser counts of possession of that cannabis. Defendant filed a motion to suppress evidence seized during a traffic stop on January 4, 2010, alleging Illinois State Police (ISP) impermissibly prolonged the stop of defendant's vehicle for a search.

¶ 5    On April 26, 2010, the trial court held a hearing on defendant's motion. Initially, the court asked defense counsel whether he was claiming the traffic stop itself was illegal or the way it was conducted was illegal. Defense counsel replied, "[t]he way it was conducted." Defense counsel played the video of the traffic stop, which showed a license plate bracket on defendant's pickup truck covered the state of registration, Arizona. The video showed Trooper Beau Marlow's interactions with defendant regarding the writing of a warning, and events leading to the search of the truck.

¶ 6    Marlow testified he is an Illinois State Police trooper and called in the traffic stop of defendant on January 4, 2010, at 11:08 p.m. for a license plate bracket that obscured the registration plate. A photo admitted into evidence showed the word "Arizona" at the top of the plate was completely covered by the bracket. Trooper Marlow was sitting in the median when he saw the blue Dodge pickup truck defendant was driving. He immediately determined the license plate was obstructed, and he initiated a traffic stop about one-half mile down the road. Marlow

approached from the passenger side of the vehicle, and he saw toys when he shined his light into the bed of the truck.

¶ 7        The passenger window rolled down, and Marlow informed defendant of the reason for the stop. He asked for defendant's license and registration, and asked defendant to accompany him back to his squad car. Trooper Marlow testified that for officer safety, he normally brings drivers to his vehicle as it takes them out of their comfort zone and removes them from any weapons they may have in their vehicle. Marlow intended to give defendant a warning. The warning form has 27 boxes to be filled in and two signatures are required. The officer is to provide additional information on the back of the form after the warning has been issued to the driver. This information includes the race and ethnicity of the driver, length of time of the stop, whether consent for a search was requested, whether a search was conducted, the reason for a search, and what was found in the vehicle and on the persons searched.

¶ 8        Trooper Marlow testified that he normally asks casual questions of persons he stops about their destination and the purpose of their trip to keep them at ease. Marlow asked defendant several questions, including where he was going, the address and name of the person he would be staying with, and if he bought the truck new. This information was not needed to fill out the warning. The upper portion of the warning form requires information Marlow knew, including the district of occurrence, county, location, and date, but he had to call dispatch to obtain the time of the stop. The second section notes whether a citation or warning is to be issued, the reason for issuance, and whether the officer was driving a marked or unmarked vehicle. Marlow was in a marked vehicle. The third section pertains to information about the individual's vehicle, part of which Marlow obtained from defendant's registration card, and part of which he had to obtain from his computer system, verifying that the vehicle was not stolen, it had not been involved in any crimes, and that

the owner had no warrants. Marlow did not recall when exactly in the process of the stop he ran the vehicle information through his computer. The final section of the warning form requires information about the driver, which he obtained from defendant's driver's license after verifying through the computer and with dispatch that it was valid. Marlow affirmed the warning would have been complete after all that information had been entered and both defendant and he had signed the warning form. Marlow said there is no set time frame in which to write a warning as no two traffic stops are the same.

¶ 9        Marlow did not know the exact time he called for a canine unit. Through his questioning of defendant and his observations, Marlow began to suspect criminal activity. Marlow testified that he called for a canine unit because, taken in totality, he saw indicators of possible criminal activity. These indicators included: the license bracket that covered the word Arizona, a state that is a source for contraband; defendant's turn signal stayed on after the stop, which is an indicator of nervousness in the presence of law enforcement; and the detection of the odor of an air freshener in the vehicle when the window rolled down. The truck's bed was partially covered by a tarp that was not providing protection from the snow and blowing winds in mid-January in northern Illinois. Trooper Marlow testified that normally he would see trucks with covers and camper shells and items inside the trucks. Marlow felt it odd that a vehicle from Arizona was traveling in Illinois at night, in sub-zero temperatures, with an infant in the back seat.

¶ 10       When questioned, the defendant said he was going to Ohio to visit a friend for a couple of days. Marlow testified that normally he found people travelling long distances for vacation would stay at their destination for a span of weeks or longer. The pickup truck was a four-door, crew cab, with a full back seat where the infant was located. No luggage or boxes were inside the truck, but Marlow acknowledged luggage may have been in the covered portion of the truck's bed. Also,

defendant did not know the last name of the friend he was going to visit. He knew his friend only by his first name and as "V." Further, the defendant did not have an address for the location in Cleveland he was traveling to. Defendant stated he was to call for directions upon reaching Cleveland. Trooper Marlow found this to be unusual.

¶ 11    Defendant became increasingly nervous as Marlow asked questions and his breathing became deeper and more rapid. Immediately after Marlow called for the dog, defendant began asking about the video camera, etc., which to Marlow showed defendant was trying to regain control of the situation and take the focus off himself. People normally talked about the traffic violation and things of that nature according to Trooper Marlow.

¶ 12    Marlow did not smell cannabis or suspect that defendant was driving under the influence, and he did not see anything illegal in the truck. From the time he and defendant entered the squad car until he completed the warning, Marlow reviewed defendant's license and registration, ran both through the computer system, and began writing the warning. Marlow could not verify defendant's license was valid from the response Arizona provided, so he contacted dispatch. Dispatch was able to determine it was valid. Marlow also asked for defendant's criminal history, which dispatch provided at the same time. When he suspected illegality, Marlow contacted a canine unit, which he said did not delay his completion of the warning.

¶ 13    Marlow handed the warning to defendant, directed him to sign, and informed him he would not be charged any money. Approximately 11 minutes elapsed from the time defendant and Marlow entered the squad car until Trooper Matt McFall arrived and the dog sniff began. The dog alerted before defendant signed the warning. Marlow had experience with the dog, Rocko, and noticed the alert and that McFall began looking into the truck's bed. Marlow informed defendant they would perform a probable cause search of his truck.

¶ 14 Trooper McFall testified he worked for the ISP on January 4, 2010, and his report states he was called to do a free air sniff at 11:08 p.m. He asked someone for the time and noted it on his report. McFall affirmed the time on his report could be the time the traffic stop had been initiated, but it was not exactly the time he had been called to the scene by Marlow. McFall did not know if the 11:08 time was accurate.

¶ 15 During their respective arguments, defense counsel and the State differed on their calculations of the timing of the events shown on the video of the stop. The trial court stated it had timed the video itself.

¶ 16 In a July 14, 2010, written order, the trial court ruled defendant was seized during a valid traffic stop. The court stated the traffic stop lasted 12 minutes, during which time the officer conducted radio inquiries regarding defendant's identity and warrant information, and the officer wrote the warning. It found a canine officer arrived, and the dog alerted within the period of the original stop. The court ruled no second seizure occurred after the original 12-minute stop ended, so there was no need for additional articulable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). The court denied defendant's motion to suppress.

¶ 17 Defendant filed a motion to reconsider on August 12, 2010, arguing that Trooper Marlow impermissibly prolonged the traffic stop when questioning defendant on matters unrelated to the stop, and when calling for a canine unit, and Marlow had no reasonable articulable suspicion to justify his questions. The trial court held a hearing on the motion to reconsider on August 24, 2010. Defense counsel reiterated the argument that Marlow asked questions unrelated to the stop, and the stop was impermissibly prolonged. The trial court responded, "[t]he fact that there are irrelevant questions being asked has absolutely nothing to do with the time to process a stop which includes record checks, warrant checks, and a stop of 12 minutes to me is incredibly quick." The

court found nothing impermissible about a police officer asking questions while simultaneously doing his or her job. It denied defendant's motion to reconsider.

¶ 18    Defendant waived a jury trial. The trial court conducted a bench trial on December 6, 2019.[2]  Following the presentation of evidence and the parties' arguments, the trial court found the State had proven its case beyond a reasonable doubt on all three charges against defendant. Ultimately, the court sentenced defendant to 12 years in prison on count I, an enhanced Class X felony, to run consecutive to a sentence imposed for federal offenses. Defendant filed a motion to reconsider sentence. The court denied his motion on June 9, 2020.

¶ 19    Defendant appeals only the trial court's denial of his motion to suppress evidence.

¶ 20                              II. ANALYSIS

¶ 21    Defendant first argues that Trooper Marlow lacked reasonable suspicion to conduct the traffic stop. The State argues defendant has forfeited this argument. We agree. At the hearing on defendant's motion to suppress, the trial court initially asked defendant's counsel whether he was claiming the traffic stop itself was illegal or the way it was conducted was illegal. Defense counsel replied, "[t]he way it was conducted." In argument, defense counsel discussed the two-pronged test reiterated by this court in *People v. Bernstein*, 383 Ill. App. 3d 296, 300 (2008) *appeal denied*, *judgment vacated*, 229 Ill. 2d 672 (2008) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Defense counsel noted the first part of the test is to determine whether the stop was justified at its inception, and he stated, "we've got the picture of the license plate bracket, you know. It's clear that [Trooper Marlow] can't see the word Arizona. So, we would submit, yes, that the stop was justified at its inception." A party forfeits his or her right to complain of an error in a trial court proceeding where

_____

[2]Defendant had been incarcerated on a 90-month aggregate sentence in Ohio on federal charges, and he requested trial in this matter pursuant to the Interstate Agreement on Detainers on March 25, 2019. The bench trial, conviction, and sentence are not at issue on appeal.

to do so is inconsistent with the position previously taken by that party. *People v. Staake*, 2017 IL 121755, ¶ 55 (citing *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000)). Thus, defendant has forfeited this argument on appeal.

¶ 22    Defendant acknowledges this issue was not preserved but asks for a plain error review under the second prong. A court may review an unpreserved error "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The first step in any plain error review is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (citing *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009)).

¶ 23    At the time of the offense, the Illinois Vehicle Code stated a vehicle registration plate "shall at all times *** be clearly visible and shall be maintained in a condition *to be clearly legible, free from any materials that would obstruct the visibility of the plate*, including, but not limited to, glass covers and plastic covers." (Emphasis added.) 625 ILCS 5/3-413(b) (West 2008) (eff. June 1, 2008, to December 31, 2012).[3] Defendant relies on *United States v. Flores*, 798 F.3d 645 (7th Cir. 2015), to assert an officer's stopping of a vehicle because of the presence of a license plate bracket is not reasonable. *Flores* is distinguishable where the officer in that case could read the words "Baja California" on the plate though some letters were partially obscured. *Id.* at 647. Further, the *Flores* court noted, "the law bans only obstructions that interfere with law enforcement's ability to read the plate." *Id.* at 648.

¶ 24    Our supreme court has interpreted "section 3-413(b) as prohibiting only those objects that obstructed the visibility and the legibility of the license plate that were physically connected or

---

[3]A 2014 addition of paragraph "g" removed any ambiguity by making the statute clearly prohibitive of any materials that would obstruct the visibility of a license plate. *People v. Varnauskas*, 2018 IL App (3d) 150654, ¶ 25 (citing 625 ILCS 5/3-413(b), (g) (West 2014)).

attached to the plate itself." *People v. Varnauskas*, 2018 IL App (3d) 150654, ¶ 24 (citing *People v. Gaytan*, 2015 IL 116223, ¶ 39). The photo of defendant's license plate admitted at the motion hearing clearly shows the word "Arizona" was completely obscured by the physically attached license plate bracket and was not visible or legible. Defense counsel did not err in conceding that the stop was justified at its inception. Defendant notes that a party may raise on appeal an unpreserved issue under the constitutional-issue exception, but there was no error below and review for plain error and ineffective assistance is therefore not warranted.

¶ 25 Defendant alternatively argues Trooper Marlow unreasonably prolonged the traffic stop by delaying the completion of the warning to await the arrival of the canine unit, and the trial court erred in denying his motion to suppress. "In reviewing a circuit court's decision on a motion to suppress evidence, we employ a two-part standard of review." *People v. Rice*, 2019 IL App (3d) 170134, ¶ 16 (citing *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006)). We defer to the trial court's findings of fact and will disturb those findings only if they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the trial court's ultimate legal ruling on a motion to suppress. *Id.* "At a hearing on a motion to suppress brought by [a] defendant claiming he was aggrieved by an illegal search and seizure, the burden is on that defendant to prove that the search and seizure were unlawful." *Varnauskas*, 2018 IL App (3d) 150654, ¶ 22 (citing *People v. Stout*, 106 Ill. 2d 77, 88 (1985)).

¶ 26 "Authority for the seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.' " *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 28 (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). The mission of a seizure consists of the purpose of the stop and related safety concerns. *Sanchez*, 2021 IL App (3d) 170410, ¶ 28 (citing *People v. Cummings*, 2016 IL 115769, ¶ 13). "Beyond determining whether to issue a traffic ticket,

an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " *Rodriguez*, 575 U.S. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). These inquiries typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 658-660 (1979)); 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507-517 (5th ed. 2012). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* (citing *Prouse*, 440 U.S. at 658-659), quoting LaFave, Search and Seizure § 9.3(c), p. 516 ("A 'warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.' "). A traffic stop may become unreasonable if it is prolonged beyond the time reasonably required to satisfy its initial purpose, or where an officer's conduct independently infringes upon the seized individual's constitutionally protected privacy interest. *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 25 (citing *Caballes*, 543 U.S. at 407-08). "Under *Caballes*, officers do not need independent reasonable articulable suspicion of drug-related activity in order to perform a dog sniff pursuant to an ordinary traffic stop." *Id.* ¶ 31 (citing *Caballes*, 543 U.S. at 409).

¶ 27     The State argues the proper calculation of the length of the traffic stop is the time between the physical stop until the dog alerted before Marlow finished writing the warning. Defendant does not calculate the length of the traffic stop. He argues that Marlow informing him the officers were going to perform a search of his truck occurred nearly three minutes after Marlow had all the information needed to complete the warning. The proverbial clock used to determine the length of a traffic stop begins to run at the moment both vehicles have come to a complete stop and the officer is or reasonably should be prepared to exit his or her police car to approach the stopped

vehicle. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 64. Here, both vehicles were stopped at 0:28 seconds into the video. Trooper Marlow began to walk to defendant's truck about 50 seconds into the video. A traffic stop comes to an end with the return of the defendant's paperwork. *People v. Cosby*, 231 Ill. 2d 262, 276 (2008). At 14:05, Marlow had defendant sign the warning. At 14:35, Marlow handed defendant his license and paperwork, which ended the traffic stop. Calculating the length of the stop from the point both vehicles came to a stop (at 28 seconds) to the point Marlow returned the paperwork to defendant (at 14:35) results in a total length of the stop of 14:07. If we calculate the length from the point Marlow left his vehicle (at 50 seconds), it results in a stop of 13:45.

¶ 28        In its written order denying defendant's motion to suppress, the trial court found, "[t]he traffic stop lasted 12 minutes during which the officer conducted ticket writing and radio dispatch inquiries regarding identification and warrant information." At the motion to reconsider hearing, the trial judge considered a 12-minute stop to be "incredibly quick." The trial court did not explain how it arrived at its conclusion that the traffic stop lasted 12 minutes. Applying the timing of events on the video recording to the case law defining when a traffic stop starts and ends, we find the trial court's determination that the stop lasted 12 minutes is against the manifest weight of the evidence.[4] But this does not end the inquiry. We review *de novo* the trial court's ultimate legal ruling on a motion to suppress (*Rice*, 2019 IL App (3d) 170134, ¶ 16), and we may affirm its judgment on any basis supported by the record. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005).

¶ 29        Defendant argues that Marlow asked him questions wholly unrelated to the purpose of the stop and otherwise delayed the completion of the warning to await the canine unit's arrival. The

---

[4]We note that the time from when the defendant exited his truck until the defendant signed the ticket was just under 12 minutes.

State argues that nothing in the record shows it did not take Marlow up to the 14:35 mark to complete the warning. "Putting pen to paper to complete the warning is only one step." *Sanchez*, 2021 IL App (3d) 170410, ¶ 32. Whether Trooper Marlow had started physically writing the warning or not, the video shows he was gathering the information necessary to do so. *Id.* We cannot say that asking defendant from where he was coming and to where he was going was necessarily unrelated to the mission of the stop. *Id.* ¶ 33. "Such questions can easily be used to determine whether the driver was coming from a bar and was intoxicated or was rushing to get to the hospital, which could help the officer determine whether to issue a warning or citation." *Id.* Even accepting that Trooper Marlow's questions were unrelated to the mission of the stop, "asking questions unrelated to the purpose of the seizure is not unlawful as long as the questioning does not extend the time the defendant was detained." *Id.* (citing *Reedy*, 2015 IL App (3d) 130955, ¶ 32), citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005), and *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

¶ 30        In this instance, the video recording shows Marlow informed defendant that the reason for the stop was that his license plate bracket covered the name of the state. At 2:22 defendant exited his truck, and he and Marlow then entered the squad car. The squad car's video recording only shows defendant clearly, but Marlow is partially reflected in the glass behind the front seat. Marlow's head is generally down as if viewing or working on something in his lap. On one occasion, Marlow reached behind the passenger seat to obtain a clipboard, which he soon replaced. Marlow is shown reaching up with a pen in his hand to touch something out of view at the top of the screen on more than one occasion. As this occurs from about the 3:15 mark in the video, Marlow questioned defendant about his travels. Defendant said he had "a couple days off." Defendant was going to Cleveland with his girlfriend and infant son. He used to live in Cleveland, and he might set up shop as many houses needed remodeling there. Defendant planned to stay with

a friend whom he knew only by his first name, Van, and whom he called "V." From about 6:15 through 7:28, Marlow stated into his radio, "K-9-3-55" and "7-K-9-3-755." He asked about an "ETA" and received the reply, "about 10 minutes." In his testimony, Trooper Marlow explained that his vehicle number was 55, and the canine unit was referred to as K-9-3, so his call "K-9-3, 55" meant that squad car 55 was calling canine unit K-9-3. Through his questioning of defendant and his observations, Marlow began to suspect criminal activity, so he called for a canine unit.

¶ 31     At 9:42, Trooper Marlow provided defendant's name and birthdate. He noted defendant's license was from Arizona. At 10:41, dispatch reported that defendant's license was valid, and he had no current records. Between 11:05 and 11:18, Marlow stated a series of numbers into the radio. Dispatch responded with a series of numbers and Marlow replied, "10-4." Marlow testified from the time he and defendant entered the squad car until he completed the warning, Marlow reviewed defendant's license and registration, he input his information into the computer system, and he continued writing the warning. Marlow could not verify defendant's license was valid from the response Arizona provided, so he radioed dispatch. Dispatch was able to determine it was valid. Marlow also asked for defendant's criminal history, which dispatch provided at that time. Marlow then asked defendant if he knew the address to which he was going. Defendant replied that he was to call to obtain the address when he arrived in Cleveland. Trooper Marlow testified that the warning form has 27 boxes to be filled in and two signatures are to be entered.

¶ 32     At 12:14, Trooper McFall came into view. He began to walk the dog around defendant's truck at 13:05; the dog alerted at 13:45 and 13:50. The video does not support defendant's argument that Marlow delayed the research he needed to fill in the warning or the writing of the warning. To the contrary, the video supports that Marlow input information into the computer. He appeared to be writing while waiting for results. He communicated with dispatch to confirm

- 13 -

defendant's license and warrant status. Marlow continued to fill in the warning until handing it to defendant to sign at 14:05. These are proper tasks to perform during a traffic stop. *Sanchez*, 2021 IL App (3d) 170410, ¶ 31. Marlow handed defendant his paperwork at 14:35, nearly one minute after the dog's first alert. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 575 U.S. at 349. "The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds time to the stop." *Id.* "In *Cummings*, our supreme court recognized that 'the fourth amendment does not draw a bright line forbidding all police actions that could prolong a traffic stop even momentarily.' " *Reedy*, 2015 IL App (3d) 130955, ¶ 33 (quoting *Cummings*, 2016 IL 115769, ¶ 19). Absent any evidence that the mission of the traffic stop would have been completed before the dog sniff occurred, we find Marlow's actions were lawful. *Id.* ¶ 39.

¶ 33        It can be said generally that it should not take over 14 minutes to write a warning ticket for a minor traffic violation. See *People v. Pulling*, 2015 IL App (3d) 140516 (Illinois State Trooper testified that it generally took him between three and five minutes to write a speeding ticket); *People v. Kats*, 2012 IL App (3d) 100683 (approximately nine minutes not unreasonably long to write a warning ticket); *People v. Baldwin*, 388 Ill. App. 3d 1028 (2009) (deputy was ready to conclude the initial purpose of the traffic stop dealing with lane violations in approximately four and a half minutes); *People v. Ruffin*, 315 Ill. App. 3d 744 (2000) (officer wrote the traffic ticket in approximately five minutes and the "business" portion of the stop took approximately ten minutes); *People v. Koutsakis*, 272 Ill. App. 3d 159 (1995) (affirming the trial court's ruling that "a stop of 14, 18, or 20 minutes was too long to write a speeding ticket for a minor speeding offense."). However, each case presents its own particular circumstances as to the time necessary to complete the traffic portion of the stop, including writing a ticket.

¶ 34    Defendant asserts our holding in *Baldwin* is "on point." We disagree. In *Baldwin*, we found no evidence that showed any issue had arisen with the running of Baldwin's information. Officer Pilat returned to Baldwin's vehicle 2½ minutes later. "Thus, at approximately 4½ minutes into the stop, Pilat was apparently ready to conclude the initial purpose of the traffic stop." *Id.* at 1034. However, Pilat did not issue a citation or warning. Instead, Pilat spoke to Baldwin for 40 seconds at his vehicle, and then for approximately 3 minutes and 15 seconds outside the vehicle. After numerous unsuccessful attempts to obtain Baldwin's consent to search his vehicle, Pilat informed Baldwin he was going to call for a drug dog, and Pilat had him return to his vehicle. Pilat called for the drug dog 30 seconds later; the canine unit arrived approximately two minutes after that. The officers explained to Baldwin what was about to occur, and the canine officer walked the dog around the vehicle. "When the sniff was completed, approximately 14 minutes had passed since the time at which Pilat's camera began recording." *Id.* at 1035. This court held the duration of Baldwin's detention was prolonged beyond the time reasonably required for Pilat to complete the traffic stop. *Id.*

¶ 35    Here, Trooper Marlow did not ask defendant for permission to search his vehicle. Importantly, Trooper Marlow testified that he could not confirm the status of the defendant's driver's license from Arizona, so he was waiting for complete information to come in from his computer and then from dispatch. This obviously delayed the stop for the traffic matter. During this time Trooper Marlow called for a canine unit and continued writing the warning. Thus, *Baldwin* is factually distinguishable and does not apply here. We also note that the defendant and Trooper Marlow entered the squad car at 2:40, at which time Marlow actually started working on the warning ticket and it was ready for defendant's signature at 14:05 (after 11 minutes and 25 seconds).

¶ 36        By his own account, defendant relates that dispatch called for a status at 5:34. Trooper Marlow called for a canine unit before 6½ minutes had elapsed. At 9:35 the dispatcher called in, and Marlow provided defendant's information. At about 10:41, the dispatcher informed Marlow of the status of defendant's license. The trial court heard the Trooper's testimony and found that during the period of the stop, he conducted inquiries regarding defendant's identity and warrant information, and he continued writing the warning. Contrary to defendant's claim that Marlow delayed the completion of the warning until after the dog had alerted, the trial court found that the canine officer arrived, and the dog sniff occurred within the period of the original stop. We cannot say these findings were against the manifest weight of the evidence and we defer to the trial court's assessment of Trooper Marlow's credibility. We affirm the trial court's denial of defendant's motion to suppress[5].

¶ 37                                     III. CONCLUSION

¶ 38        For the foregoing reasons, we affirm the judgment of the circuit court of Henry County.

¶ 39        Affirmed.

¶ 40        PRESIDING JUSTICE McDADE, specially concurring:

¶ 41        I specially concur in the majority's order because, although I agree that defendant's motion to suppress was properly denied under the unique facts of this case, I believe the drug interdiction programs that enabled the stop are both pernicious and fatally flawed. Despite the majority of traffic violations being ignored by police, as part of these programs "[s]ome drivers are pulled over *** not because their driving is especially dangerous, nor even because of ordinary bad luck." Samuel R. Gross & Katherine Y. Barnes, Road Work: Racial Profiling and Drug Interdiction on

---

[5]While I may not disagree with most of the assertions in the special concurrence, I believe much of the content is unnecessary for our resolution of this case.

the Highway, 101 Mich. L. Rev. 651, 671 (2002). The interdiction program at the heart of this appeal fits that archetype, replicating many of the harms that flow from the multitude of similar programs being conducted nationwide.

¶ 42     The majority of those programs are an outgrowth of the Federal Drug Enforcement Administration's (DEA) 1984 Operation Pipeline. *Id.* Operation Pipeline has been described by the California Highway Patrol "as an 'intensified enforcement' program to find illegal drugs by generating 'a very high volume of legal traffic enforcement stops to screen for criminal activity, which may include drug trafficking.' " *Id.* (quoting California State Assembly Democratic Caucus Task Force on Government Oversight, Operation Pipeline: California Joint Legislative Task Force Report (Sept. 29, 1999) (California Joint Legislative Task Force Report), available at http://www.aclunc.org/discrimination/webb-report.html). In implementing that initiative, the DEA intended to create " 'a nationwide highway interdiction program that focuses on private motor vehicles,' as part of which, '[e]ach year, state and local highway officers conduct dozens of training schools across the country, attended by other highway officers.' " *Id.* (quoting Drug Enforcement Administration, U.S. Dept. of Justice, Operations Pipeline and Convoy, at http://www.usdoj.gov/dea/programs/pipecon.html). A common thread among that national web of programs encourages police to "systematically us[e] their virtually unrestricted power to stop cars as a tool to hunt for illegal drugs." *Id.* To support that initiative, "the Federal government authorized a block-grant program to state and local police departments, specifically offering direct money payments as an incentive for drug interdiction programs." Philip J. Sweitzer, Drug Law Enforcement in Crisis: Cops on Steroids, 2 DePaul J. Sports Law & Contemporary Problems 193, 213 (2004). Since that time, law enforcement officers have been "trained to convert minor traffic offenses into drug investigations that may yield forfeiture proceeds." Beth A. Colgan, Revenue,

Race, and the Potential Unintended Consequences of Traffic Enforcement Reform, 101 N.C.L. Rev. 889, 910–11 (2023).

¶ 43    In my view, the traffic stops routinely conducted as part of those interdiction programs cannot be permitted to continue to harass and violate the state constitutional rights of drivers on our roadways. Every day, drivers are stopped for minor traffic infractions that are often unabashedly pretextual and premised on factors not shown to corollate with any criminal activity. Those drivers are then subjected to highly intrusive and inconvenient searches based on nothing more than the officer's subjective hunch, fueled by those unreliable factors, that the vehicles contain illegal contraband. Although "[t]his practice--using traffic stops as a pretext for drug investigations--is perfectly constitutional," at least as presently construed by the United States Supreme Court (see *Whren v. United States*, 517 U.S. 806, 815-819 (1996)), the pretextual stops and searches that are subsequently conducted " 'blanket[] motorists on certain routes with traffic tickets or warnings,' " enabling interdiction teams " 'to pull over a great many cars to find drivers who fit established "profiles" of what drug couriers reportedly look like and act like. If the motorist "fits" the profile, then the officer's goal becomes to conduct a warrantless search of the car and its occupants, in the hope of finding drugs, cash and/or guns.' " Gross & Barnes, 101 Mich. L. Rev. at 671 (quoting California Joint Legislative Task Force Report). In far too many instances, courts have strained the bounds of the fourth amendment, effectively giving officers virtual *carte blanche* to search pretextually stopped vehicles without offering *any* showing that the rationales underlying those searches bear a single indicium of reliability. See Colgan, 101 N.C.L. Rev. at 911 (stating that "so long as the officer has probable cause (again, a fair probability) that a traffic offense has occurred, or reasonable suspicion (less than probable cause) that a traffic offense is ongoing, the officer effectively has a license to go 'fishing' ").

¶ 44    As our decision in *People v. Roa*, 398 Ill. App. 3d 158 (2010), made abundantly clear more than a decade ago, even an officer with 17 years of experience in conducting interdiction stops cannot reliably determine when contraband is likely to be present. There, the officer testified that he failed to discover any evidence of criminal activity, apart from the initial basis for the stop, in *fully two-thirds of the roadside searches he executed. Roa*, 398 Ill. App. 3d at 175-76 (McDade, J., dissenting). The implications of that admission are staggering. By his own estimate, that one officer had detained and subjected at least 2,000 totally innocent motorists to wide-reaching searches that resulted in absolutely no findings of other wrongdoing. Notably, that estimated number reflected the officer's personal count 10 years ago and has undoubtedly risen since that time. Unwarranted searches such as those have routinely involved accessing remote recesses of the vehicles, such as behind the airbag, a process that requires the vehicles to be partially dismantled along the roadside. Given the officer's admission in *Roa* that, despite his "vast" experience, his finding of reasonable suspicion to search yielded contraband only 33% of the time, those findings cannot fairly be said to have been premised on anything more than a subjective "hunch" that criminal activity was afoot.

¶ 45    Unfortunately, the state of the law in Illinois still permits those types of unwarranted intrusions into the privacy of motorists driving on our roadways today. Nothing in our case law suggests that law enforcement officers' application of the factors typically used to find "reasonable suspicion of criminal activity" has become even marginally more reliable. Thus, this institutionalized assault on the driving public's right to privacy and protection from unreasonable searches continues unabated, unimpeded by any serious judicial review of the validity of the factors used to justify those searches.

¶ 46    The tide may be turning, however, at least in some jurisdictions that have dared to take a closer and more realistic look at the injustices and governmental overreaching wrought all-too-often by the nation's highway drug interdiction programs. In *Shaw v. Jones*, ___ F. Supp. 3d ___, *1 (D. KS July 21, 2023), the federal court has recognized the expansion of the wrongs inflicted on the motoring public by interdiction programs that has accompanied the legalization of recreational marijuana in 23 states and the District of Columbia. "[I]n the name of drug interdiction, the Kansas Highway Patrol *** has waged war on motorists—especially out-of-state residents traveling between Colorado and Missouri on federal highway I-70 in Kansas. As wars go, this one is relatively easy; it's simple and cheap, and for motorists, it's not a fair fight. The war is basically a question of numbers: stop enough cars and you're bound to discover drugs. And what's the harm if a few constitutional rights are trampled along the way?" *Id.* The same concerns are present in our Illinois jurisprudence.

¶ 47    Rather than reconsidering the validity and efficacy of drug interdiction programs, however, Illinois law enforcement has chosen to adopt a work-around to support its unconstitutional invasions. That work-around appears to be torn from the same playbook used by the Kansas Highway Patrol in *Shaw*. It relies on the wholesale "exploit[ation of] fundamental precepts of the American legal system, along with the ignorance and timidity of the motoring public." *Id.*

¶ 48    Today's wealth of traffic laws has given troopers increasing cover to initiate stops designed to advance the purposes of drug interdiction programs rather than the safety of the public or the state's highways. Our statute books are replete with traffic laws ostensibly giving troopers "innumerable reasons to stop motorists for violations which may involve public safety, but the stops [are] actually intended to investigate drug crimes for which they have little or no evidence. [Fn.]." *Id.* To be constitutionally viable, however, any search must be preceded by "at least a

reasonable, articulable suspicion that a violation of the law has occurred. [Citation.] If reasonable suspicion is lacking, the traffic stop is unconstitutional, and any evidence obtained as a result of the stop will generally be inadmissible." *Varnauskas*, 2018 IL App (3d) 150654, ¶ 21. In the absence of reasonable suspicion, the law enforcement officer must obtain the motorist's consent to search, a task that oftentimes merely requires a simple request given that "[m]ost drivers do not know that they have a right to deny consent, and troopers are more than happy to exploit their lack of knowledge of their legal rights. [Fn.]." *Shaw*, ___ F. Supp. 3d ___, *2.

¶ 49     If a driver fails to immediately acquiesce to that request for consent, however, interdiction officers are trained to adeptly perform what *Shaw* called "the Kansas Two-Step." To perform the Two-Step, the officer appears to conclude the purpose of the original stop, signal that the driver is free to leave, then "immediately re-engage[s] the driver in friendly, casual conversation to keep the driver at the scene and enable the trooper to develop reasonable suspicion or take another stab at getting consent." *Id*. Similar dances are all too familiar in this state's case law. See, *e.g.*, *People v. Cummings*, 2016 IL 115769; *People v. Sanchez*, 2021 IL App (3d) 170410; *People v. West*, 2017 IL App (3d) 130802; *Roa*, 398 Ill. App. 3d 158. And, if a particularly recalcitrant driver still declines to give consent, the trooper may nonetheless proceed with a search, premised on the new rationale that reasonable suspicion to search existed from the initiation of the stop. *Shaw*, ___ F. Supp. 3d ___, *2.

¶ 50     Another unconscionable tactic often used as part of interdiction protocols is to base searches on travel to or from a state purported to be a "drug source" or "drug destination." That observation can then be used to rationalize searching the vehicles of innumerable travelers based merely on their residence in, or other connection to, any of the many states nationwide that are spanned by Interstate 80, a purportedly known drug corridor. As in this case, the fact patterns in

our decisions are replete with accounts of the "special attention" interdiction officers have given to drivers behind the wheel of vehicles bearing out-of-state license plates. *People v. $8,986 United States Currency*, 2021 IL App (2d) 200764-U; *People v. Davenport*, 392 Ill. App. 3d 19 (2009); *People v. Taylor*, 245 Ill. App. 3d 602 (1993); *People v. Cardenas*, 237 Ill. App. 3d 584 (1992). See also *Shaw*, ___ F. Supp. 3d ___, *5 (noting that "even accounting for the disparity in initial traffic stops, out-of-state drivers are disproportionately subjected to canine sniffs once they are stopped"). The same phenomenon has been recognized in other states as well. *Shaw* pointed out the "significant statistical disparity between stops and searches of in-state versus out-of-state motorists, [which made it] clear that KHP troopers target out-of-state drivers for traffic stops and canine sniffs." *Shaw*, ___ F. Supp. 3d ___, *6.

¶ 51        As the *Shaw* court explained, an officer's reliance on a traveler's state-of-origin to find reasonable suspicion to search constitutes a clear violation of the driver's federal fourth amendment rights. *Id.* at *13 (citing *Vasquez v. Lewis*, 834 F.3d 1132, 1137-38 (10th Cir. 2016) (stating that traveling from a state where marijuana is legal provides only minimal support to an officer's finding of reasonable suspicion)). Nonetheless, the use of that patently unreliable pretext provides additional cover for law enforcement to stop and search vast numbers of out-of-state drivers, both innocent and guilty. The available evidence shows, however, that the brunt of that burden falls on minority drivers, who are consistently still stopped and searched at disproportionately high rates.

> "The breadth of *Wren*'s loosening of [law enforcement's constitutional constraints, particularly when illegal drugs could be involved,] may be particularly troubling. Race often appears to be a factor in the law enforcement profiling that determines who will be targets of the routine traffic stop turned consent search. Yet, even seizures based on racial

- 22 -

profiling offend no Fourth Amendment principle according to *Whren*. Thus, *Whren* appears to sanction a not-so-subtle form of government law enforcement racism." Robert H. Whorf, Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique, 28 Ohio N.U.L. Rev. 1, 25-26, 66 (2001).

¶ 52        That conclusion is consistent with data compiled in 2017 by the Illinois Department of Transportation, which reveals that minority drivers are almost 50% more likely than nonminority drivers to be stopped on our roadways. *People v. Williams*, 2020 IL App (3d) 180024, ¶¶ 80-81 (McDade, J., dissenting). After instigating those stops, police also ask minority drivers for consent to search at much higher rates than they do white drivers, with African Americans being asked roughly 60% more frequently and Latinos about 40% more frequently. *Id.* Although those disparate statistics may be justifiable if the ensuing searches of minority drivers yielded evidence of drugs more frequently than searches of their white counterparts, the data supports the opposite conclusion. In 2017, contraband was found during consent searches of white drivers roughly 30% more frequently than after searches of either African American or Latino drivers. Thus, interdiction programs further institutional discrimination against drivers of color, who are all too often "the disadvantaged victims of implicit bias and, ultimately, systemic racism, which has provided police with unfettered discretion on Illinois roadways." *Id.* As judges, we cannot continue to look past the blatant failures and harm done by our state's drug interdiction programs, giving them a free pass to conduct inherently discriminatory, and nonproductive, vehicle searches based on only officers' unproven and unreliable "hunches." The injustice of continuing to operate those programs is manifestly evident, and they frequently constitute a clear violation of motorists' constitutional rights.

¶ 53	Fortunately, the privacy clause of our Illinois constitution provides critical protection against unreasonable searches that is far too often overlooked by our case law. Under the Illinois privacy clause, if contraband is not in plain sight, the officer must have "a specific and articulable criminal causal basis *** to ask a motorist for his or her driver's license, and/or to seek out other inherently personal information." *Id* ¶ 86 (McDade, J., dissenting). "[O]ur courts have a duty to deny our *imprimatur* to the manner of the disclosure and the subsequent use of information or evidence flowing from the invasion of privacy." *Id*. ¶ 86 (McDade, J., dissenting). Yet, a dearth of case law upholding this unique and vital state protection exists.

¶ 54	Instead, as in *Shaw*, Illinois troopers may base decisions to conduct highly questionable roadside searches on "an absurd and tenuous combination of factors," the majority of which "are so ordinary and benign that thousands of innocent drivers *** every day likely share many or all of these factors." *Shaw*, ___ F. Supp. 3d ___, *15. I maintain that a valid finding of reasonable suspicion cannot be premised on "an amalgamation of overwhelmingly common and mundane factors. None of [which] contribute more than minimally to reasonable suspicion, if at all." *Id*.

¶ 55	In the instant case, after noting that defendant's license plate was from a state known as "a source for contraband" and was obscured by a bracket, Trooper Marlow asked defendant "where he was going, the address and name of the person he would be staying with, and if he bought the truck new." In requesting to search the vehicle, the trooper also relied on defendant's failure to deactivate his turn signal after the truck was stopped, as well as the odor of air freshener when the truck's window was opened. According to the trooper, failing to turn off a turn signal allegedly revealed that defendant was unnerved by encounters with law enforcement. *Supra* ¶¶ 8-9. In my view, none of those factors is sufficient to constitute unusual or suspicious conduct indicative of criminal activity.

¶ 56 In addition, the trooper thought it was unusual that "[t]he truck's bed was partially covered by a tarp that was not providing protection from the snow and blowing winds in mid-January in northern Illinois." *Id.* ¶ 9. He also believed it was odd that a driver from Arizona would cross Illinois with items in the truck bed, without a cover or camper shell, and with an infant in the backseat on a night when the temperature was below zero. *Id.* ¶ 9. None of those facts, however, seem particularly noteworthy to me. Being from Arizona, defendant was likely unaccustomed to midwestern winters and less likely than a native Midwesterner to own the camper shell or bed cover that the trooper believed was vital for winter travel. Further undermining the validity of his concerns, the load in the truck bed was, as Trooper Marlow acknowledged, in fact partially covered and not left entirely open to the elements. Moreover, defendant was not traveling alone at night with an infant in the backseat; the child's mother, defendant's girlfriend, was beside the child. In my experience, defendant would not be the first parent to recognize the advantages of traveling with a sleeping baby. The presence of the baby would also suggest a legitimate and reasonable basis for having an air freshener in the enclosed space.

¶ 57 In an attempt to further support his finding of reasonable suspicion, Trooper Marlow cited several other factors, such as defendant's assertion that he was going to visit a friend in Ohio, who he identified only as "V" or by his first name, for a few days. The officer found this response suspicious due to his belief that people generally stayed at their destinations much longer after making such a lengthy trip. While the trooper was also troubled by defendant's inability to provide his friend's address, defendant offered the reasonable explanation that he intended to call for directions once he arrived in Cleveland. When questioned, the trooper even admitted that the allegedly conspicuous absence of luggage in the truck's cab could be readily explained because it was stowed in the covered portion of the truck bed. *Id.* ¶ 10. Undeterred by these reasonable

explanations, however, the trooper went on to conclude that an increase in the depth and speed of defendant's breathing during questioning was indicative of his growing nervousness. According to the trooper, defendant's diversion of their conversation from the purpose of the stop to various aspects of the squad car's equipment suggested an attempt to alter the subject of the officer's focus. *Id.* ¶ 11.

¶ 58    Notably, each of the factors asserted by the trooper was of the same type that the *Shaw* court determined to be "so ordinary and benign that thousands of innocent drivers on [state] highways every day likely share many or all of these factors," making it "inappropriate for \*\*\* troopers to develop reasonable suspicion based on an amalgamation of overwhelmingly common and mundane factors. None of these factors contribute more than minimally to reasonable suspicion, if at all." *Shaw*, ___ F. Supp. 3d ___, \*15.

¶ 59    In my view, that analysis applies equally here. Common experience recognizes that many completely innocent motorists become nervous after being pulled over and approached by a highway trooper at night. Indeed, Trooper Marlow testified that one of the reasons he removes motorists from their vehicles during roadside stops was to take them out of their comfort zones. It is also reasonably foreseeable that a motorist's discomfort would increase after being barraged with questions bearing no apparent connection to the alleged reason for the stop. Such "common and mundane" reactions cannot support a constitutionally valid finding of reasonable suspicion. *Id.* Furthermore, the State failed to offer any evidence establishing that any of those routine factors provided scientifically reliable or data-driven indicia of ongoing criminal conduct. See *Id.* at \*18, n. 46. Accordingly, the trooper's ensuing hunch that defendant was involved in criminal activity based on those factors, viewed together or separately, is legally untenable.

¶ 60            Unfortunately, courts reviewing the types of well-worn justifications offered by officers engaged in drug interdiction programs often rely almost entirely on the officers' perceived experience and expertise rather than on objective data demonstrating their connections to criminal activity. As *Roa* demonstrated, however, even an officer's "vast" experience and expertise have been proven to be demonstrably *unreliable* bases for finding reasonable suspicion to search, only rarely netting any type of contraband. *Roa*, 398 Ill. App. 3d at 176 (McDade, J., dissenting). To achieve and maintain a fair and just system of criminal law, courts and law enforcement agencies must take a harder and more realistic look at the effectiveness and constitutionality of the interdiction experiments that have been playing out daily on our nation's roadways for decades.

¶ 61            The tax dollars of Illinois motorists built our state roads and highways, and their constitutionally protected rights preclude the State from interfering with their rightful use of those roadways. Motorists should be free to travel where they choose without fear of being arbitrarily stopped and detained for extended periods of time without proper cause. Pretextual detentions can, and do, result in serious consequences or unwarranted delays and inconvenience for both the stopped motorist and any unfortunate passengers without any commensurate benefit to the public. Too often, those consequences have included motorists being left stranded on the roadside alongside their dismantled vehicles. Although the stops executed by police interdiction teams are purportedly intended to protect the public from illegal drugs being unleashed on our streets, case law and research reveal that the overwhelming majority of the searches conducted pursuant to those programs uncover no contraband at all. None. See *Roa*, 398 Ill. App. 3d at 175-76 (McDade, J., dissenting). That state of affairs cannot constitutionally be allowed to continue.

¶ 62            Nonetheless, despite my deep and ongoing concerns about the justification and operation of highway drug interdiction programs in both Illinois and across the country, I am compelled to

concur with the majority's determination that the search here was conducted within the "tolerable duration" of the original traffic stop. See *Shaw*, ___ F. Supp. 3d ___, *3 (citing *Rodriguez*, 575 U.S. at 354). As the Supreme Court held in Justice Ginsburg's decision in *Rodriguez*, 575 U.S. at 350, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Period. No exceptions. "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id*. (quoting *Caballes*, 543 U.S. at 407). See also *West*, 2017 IL App (3d) 130802 (McDade, J., dissenting).

¶ 63 After analogizing a routine traffic stop to a *Terry* stop and citing a number of the Court's prior decisions, *Rodriguez* directed that "the tolerable duration of police inquiries *** is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, *Caballes*, 543 U.S. at 407, and attend to related safety concerns." *Id*. at 354. Consequently, to be constitutional, each stop "may 'last no longer than is necessary to effectuate th[at] purpose.' " *Id*. Pursuant to the Court's express instructions, after the activities inherently "tied to the traffic infraction are—or reasonably should have been —completed," law enforcement loses all authority to continue the seizure. *Id*. Here, in sharp contrast to many of this court's prior decisions, that moment did not occur until after the drug dog alerted to defendant's truck. But for the fact that the trooper's failure to complete defendant's warning ticket prior to that moment under the unique circumstances presented here, this case would be indistinguishable from the roadside searches held to be unconstitutional in *Shaw*. But that alert by the drug dog occurred and must be acknowledged.

¶ 64 I am still compelled to write separately, however, to emphasize that drug interdiction programs too often subvert the mandate in our state and federal constitutions that all drivers,

regardless of their race, nationality, guilt, or innocence, receive the same fundamental protections from government overreach. See *Roa*, 398 Ill. App. 3d at 177 (McDade, J., dissenting). Those safeguards offer the only protection drivers, particularly drivers of color, possess against an onslaught of unjustified, unreasonable, and highly inconvenient searches resulting from unsuccessful experiments such as the Illinois highway drug interdiction program. As the federal Fourth Circuit Court noted decades ago, "The exigencies of law enforcement do not, of course, override a citizen's constitutional rights." *United States v. Flowers*, 912 F. 2d 707, 710 (4th Cir. 1990).

¶ 65          In my view, by relying on the subjective hunches of overzealous officers, the continued operation of these ill-conceived and error-filled interdiction programs constitutes an unacceptable assault on drivers' constitutionally protected rights and privacy and must end. The implicit judicial sanctioning of those programs has restricted the protection of the fourth amendment beyond any reasonable limits, resulting in constitutional violations that fail to even minimally advance the programs' stated purposes. Our courts must recognize the damaging realities of constitutionally invalid policing practices and adopt principles such as those reflected in the federal district court's comprehensive analysis in *Shaw*. For the reasons stated herein, however, I respectfully concur in the majority's decision.